**Russell D. MILLS, Sr., and Norma J. Mills, His Wife, Appellants,**

**v.**

**W. H. KEASLER and Rebecca A. Keasler, His Wife, and Felix Hampton, Jr., Respondents.**

**No. 50988.**

Supreme Court of Missouri,

Division No. 1.

Nov. 8, 1965.

Edwin Rader, Herbert Lasky, Clayton, for appellants.

Riddle, O'Herin & Newberry, Malden, for respondent, Felix Hampton, Jr.

HOUSER, Commissioner.

This is a suit in equity to rescind a contract for the exchange of real estate and for $75,000 actual and $750,000 punitive damages for breach of contract and fraud. The court found the issues for the defendants and the plaintiffs have appealed.

Respondents have filed a motion to dismiss the appeal for violation of the rules governing the preparation of appellate briefs. Respondents attack the statement of facts as improper and nothing but a résumé and find fault with the statement of the points and authorities and appellants' failure to develop them, and appellants' failure to key the argument to the transcript with page references. Notwithstanding the brief is subject to most of respondents' criticisms we overrule the motion to dismiss. The brief has been sufficient to enable respondents to identify the issues presented and to answer appellants' contentions, and is sufficient to enable the court with reasonable certainty and effort to ascertain what the issues on appeal are and appellants' contentions with reference thereto.

As a suit in equity this case is to be reviewed de novo on the record made in the trial court, Smith v. Mitchell, Mo.Sup., 394 S.W.2d 308 (No. 51002 decided September, 1965), and we make our own findings of fact, draw our own conclusions of law, and render or direct the rendition of such judgment as equity and justice may require, giving proper deference to the findings and conclusions of the trial judge in the case of conflicting testimony.

These are the pertinent facts as we find them: Plaintiffs are Mr. and Mrs. Russell D. Mills, Jr., former owners of a motel at Eldon, Missouri. Defendants are Mr. and Mrs. W. H. Keasler, former owners of a 2,000 acre tract of land in Jackson County, Illinois, and Felix Hampton, Jr., a real estate broker. Desiring to sell the motel the Mills listed it with Hampton. Keasler had previously agreed to give Hampton a finder's fee if he sold the farm. Hampton got in touch with Keasler and interested him in a trade. Both properties were heavily encumbered. In September, 1961 when these negotiations began and on October 4, 1961 when the exchange contract was executed there was a first deed of trust on the 2,000 acres held by Connecticut General Life Insurance Company to secure a debt which then amounted to $88,000 and there was a second deed of trust on the 2,000 acres held by Loyd Bentsen, on which there was a balance due of $79,000. Keasler had a contract to sell 800 acres of the 2,000 acres to an eastern syndicate. Hampton tried to interest Mills in the remaining 1,200 acres. While not interested in a deal of that size Mills expressed interest in a trade when Keasler agreed to divide the 1,200 acres into two tracts of 560 and 640 acres. On September 27, 1961, after Keasler had inspected the motel and after Mills had viewed the 640 acre tract, the parties had a discussion in which Keasler told Mills that he had 2,-000 acres encumbered by mortgages; that he had a contract for the sale of 800 acres and would have to secure new loans, take off the mortgages against the 2,000 acres "and cut it down to the difference" so as to

"cut the mortgage to not exceed eighty-two five against the 640" and Mills would give Keasler his note back for the difference between the value of the 640 acres and the motel. Keasler testified that prior to the signing of any contract he discussed with Mills the amount of the encumbrances or mortgages against the land in Illinois and who owned or held the mortgages, giving their names. Mills, on the contrary, testified that he was informed by Keasler and Hampton and understood that there was one debt of $88,000 against the 640 acres, a loan made by Connecticut General Life Insurance Company, and that that was the only deed of trust against the place. Mills denied knowledge prior to the execution of the exchange contract of a deed of trust in favor of Loyd Bentsen. On this direct conflict in the testimony we defer to the finding of the trial chancellor, who saw and heard the witnesses and had the best opportunity to judge of their credibility, and find that Mills was fully informed as to the existence of both deeds of trust and was given the names of the holders of the notes prior to the execution of the exchange contract. After further discussion the parties came to an oral understanding for an exchange of the properties on these terms: Keasler was to get the motel subject to a first deed of trust for $36,000, a second deed of trust for $133,600 and a third deed of trust for $2,750. Mills was to get the 640 acres subject to encumbrances not to exceed $82,500. It was understood that the 2,000 acre farm was to be split up into three separate tracts: the 800 acre tract sold to the syndicate, the 640 acre tract, and the remaining 560 acres. The encumbrances on the 2,000 acre farm were to be removed from the whole tract, the deeds of trust changed and new loans negotiated. Keasler's equity in the 640 acres over and above the $82,500 was agreed to be worth $36,650 more than Mills' equity in the motel. Mills was to give Keasler a note for the difference, secured by a deed of trust on the 640 acres. Keasler was to lease the 640 acres for 2 years and pay as rent the installments of principal and interest to come due on notes in the amount

of $82,500 and $36,650, and pay the insurance and taxes on the land.

The parties went to the office of Jack Edwards, a lawyer in Sikeston, to reduce the agreement to writing. Keasler wanted possession of the motel the following Monday, October 1. Mills objected, preferring to wait until October 22 for closing in order to allow time for the examination of the title. Hampton assured Mills that this was not necessary and could be "worked out"; that Mills had nothing to worry about; that Hampton knew Keasler and had had previous dealings with him, and knew him to be a very wealthy man; that Mills should let Hampton handle it; that he was Mills' broker and Mills was paying him to handle it. Mills then agreed to enter into the contract without a prior examination of the abstract of title. The lawyer had his secretary prepare a rough draft of a contract containing the provisions orally agreed upon and among other things the following: An agreement by the parties each to convey to the other titles good in fact and merchantable of record by general warranty deed free and clear of encumbrances, except as noted in the contract; to furnish each other with a complete abstract of title within 20 days showing well vested merchantable title, with 10 days allowed for examination and a reasonable time to correct defects found. Following the lease provisions there was a provision reserving to Mills the right to sell the 640 acres during the term of the lease, in which event the Keaslers agreed to surrender possession on December 31 of the year in which the sale was made. Possession of the motel was to be delivered upon execution of the contract. Deeds were to be delivered on December 15, 1961.

The matter of real estate commissions was discussed by Mills, Keasler and Hampton at that meeting. It was agreed that Mills was to pay Hampton a commission of $13,250 as follows: $3,250 cash and a $10,000 note secured by a deed of trust on the 640 acres. Hampton and Keasler made it known to Mills that Keasler owed Hampton a $5,000 commission or finder's fee for Hampton's services in connection with this exchange of properties. Keasler did not have the money to pay the $5,000. At first the giving of a note by Keasler to Hampton was considered. Then it was decided to deduct $5,000 from the amount of the note from Mills to Keasler and add $5,000 to the note from Mills to Hampton. Mills consented to this arrangement, whereupon the figure $36,650 in the contract was changed to $31,650.[1] At Mr. Edwards' office each of the parties signed a warranty deed form in blank. The blanks were not filled in at the time because the legal descriptions of the lands were not immediately available. On the same day, September 27, Keasler delivered ten abstracts of title to the 640 acres to Mills, who took them the next day to Eldon and Tuscumbia, looking for a lawyer to examine them. He went to the offices of three lawyers, all of whom were out of town on the weekend. Mills at that time wanted to ascertain the condition of the title to his own satisfaction and was not at that time depending on Hampton to find out about the title. Mills thought that it would take 2 or 3 weeks to have the title examined. Before signing the exchange contract Mrs. Mills questioned Hampton about running the abstract of title. Hampton said there was no point in doing that because he knew Keasler and had done business with him and

---

1. Mills acknowledged that he consented to the addition of $5,000 to the one note and the subtraction of $5,000 from the other but Mills did not relate the $5,000 to the instant transaction. On the contrary Mills testified that Keasler and Hampton were referring to a *previous deal* between them involving a business transaction in Kentucky or Tennessee. This, however, was denied by Hampton who testified that Keasler did not owe him any money from a prior transaction and by Keasler, who testified that they had never had any previous dealings with each other. On this direct conflict in the testimony involving the credibility of witnesses we defer to the trial court's general finding for defendants, which we presume to have been favorable to them on this contested issue and conclude that the $5,000 obligation related to the instant transaction.

that Hampton could "handle it." The Mills trusted Hampton because they had known him for many years. He had previously transacted business for the Mills. The Mills knew that under the exchange contract they had until December 15 to have the abstracts examined. The Mills themselves made no further efforts to have the abstracts examined because after they executed the exchange contract, notes and deeds of trust, Hampton took from them the papers and abstracts of title and told the Mills to go ahead and make their planned move to St. Louis, assuring them that he would handle it. Relying upon Hampton's promises the Mills left in Hampton's hands the matter of accomplishing the division of the 2,000 acres into three tracts, the rearrangement of the deeds of trust, getting an abstract "of their own" on the 640 acres and the examination of the abstracts of title, "figuring on him getting it done."

The exchange contract was dated October 4, 1961. The two warranty deeds were dated and the acknowledgments bore that same date. The Mills signed and delivered a $15,000 note to Hampton, signed and delivered a note to Keasler in the amount of $30,650,[2] and gave Hampton a check for $3,250. A lease of the 640 acres had been prepared for Keasler to sign but he refused to sign it, claiming possession under the provisions of the exchange contract relating to leasing. The copy of the exchange contract produced by the Mills shows the interlineation of the following words, among others, in the provision relating to the lease: "at agreed rental of Fourteen Thousand Three Hundred Fifty Dollars each year" and "If the above payments of principal, interest, insurance and taxes do not amount to yearly rental sum, difference shall be paid in cash." We do not find that these interlineations were in the contract when it was signed by the Keaslers, or that the Keaslers agreed to these changes; we do find that these interlineations were made after the Keaslers signed and without their consent.

In an effort to "split the land and get new loans" on the 560 and 640 acre tracts by December 15, the date set in the contract for the closing (by delivery of deeds), Keasler applied to a mortgage company for a new loan on the property. Keasler could not get this accomplished as to the 640 acre tract because Mills' deed had been recorded on October 6, 1961, instead of waiting to record it until December 15, the contractual date for the delivery of the deeds. With the title to the 640 acres out of Keasler and in Mills the mortgagee Bentsen would not accept a new deed of trust signed by Keasler and would not accept Mills' paper. During October, November and December, 1961 Keasler had several meetings with the mortgagees or their representatives (at some of which meetings Mills was present) in which arrangements were attempted to be made for the reshuffling of the mortgages by Mills reconveying to Keasler, placing the deed in escrow while making arrangements with the insurance company and the Bentsens, and then Keasler reconveying to Mills subject to the new deeds of trust. Mills, however, did not agree to this and did not put his deed in escrow. At Mills' request, however, Hampton released his fourth deed of trust and placed it in escrow to assist in straightening out the title. In April or May, 1962 Mills and Keasler flew to Mission, Texas, home of Loyd Bentsen, in an unsuccessful effort to secure Bentsen's agreement to a proposed method of clearing up the title. Keasler filed his deed to the motel for record on December 21, 1961. Keasler obtained possession of the 640 acre tract and leased it to one Devore. Although Mills made an effort to obtain possession of the 640 acres in 1962 he was unable to do so, and was threatened by Devore if he was seen on the land. Mills has never received one cent from Keasler or anyone else for the possession and use of the land. In 1962 the

2. There is no accounting for the $1,000.-00 discrepancy between the amount agreed to in the contract and the actual amount of the note.

640 acres and the "other farm" yielded $7,-000 rent but the Mills received none of that. Some of the $7,000 was received "through the soil bank." On January 1, 1962 the first payment on the $30,650 note came due. Keasler had assigned it to one Albrecht, who made a demand upon Mills for payment. Mills refused, stating that the note was not due; that Keasler had guaranteed that the note would be paid out of the crops and cancelled. From October, 1961 through June, 1962 Mills pressed Hampton to get the thing straightened out or to get a contract for the sale of the 640 acres, under an option he gave Hampton on October 3, 1961 to sell the land. In March or April, 1962 Mills "soured on the arrangement" and gave Keasler until June 5 to straighten things out. Several new mechanics' liens were filed against the property. In May or June, 1962 Mills called Hampton on the telephone and tried to "get his motel back." Mills complained that Hampton "wouldn't do anything." In June, 1962 Mills was still after Hampton, trying to get him to find a buyer for the place. In September, 1962 Hampton told Mills that he was going to take over the 640 acres under the note he held. In that same month, September, 1962, Keasler paid the mortgages on the Illinois land down to $82,500, paid a mechanic's lien in the sum of $2,700 and paid the taxes up to date. Mills filed suit on December 10, 1962. The holder of the second mortgage on the motel foreclosed on February 8, 1963, and there is some evidence that at the time of trial foreclosure proceedings on the 640 acre farm had been instituted by Bentsen. It was stated in oral argument and not denied that through foreclosures the Keaslers have lost the motel and the Mills have lost the 640 acres.

Plaintiffs' first two points are that the court erred in not awarding damages against the Keaslers and in denying plaintiffs equitable rescission of the contract because the Keaslers violated and breached the terms of the exchange contract by deeding and exchanging the 640 acres subject to encumbrances in excess of $82,500. The evidence shows that on October 4, 1961, the date the exchange contract was signed, and on December 15, 1961, the date fixed by the contract for the delivery of the deeds, the encumbrances exceeded $82,500. They totalled $167,000. Plaintiffs claim that the breach of the agreement that encumbrances were not to exceed $82,500 on December 15, 1961 entitles them to declare the contract at an end and to recover the following damages which they claim resulted from the breach: the return of the $3,250 paid the real estate broker as a commission; the cancellation of the $31,650 note given the Keaslers; the cancellation of the $15,000 note given Hampton, and recovery of the reasonable value of plaintiffs' equity in the motel property.

■ *As to the defendants Keasler:* Plaintiffs are in the anomalous position of suing in one count for both rescission of the contract and damages for breach of the contract. Of course plaintiffs may not at the same time successfully pursue both the remedy of rescission and that of an action for damages because they are inconsistent, the first resting upon a disaffirmance and the second resting upon an affirmance of the contract. 17 C.J.S. Contracts § 167, p. 940. Under the facts as we have found them plaintiffs are not entitled either to rescission of the exchange contract or to recovery of the substantial damages they seek from the Keaslers. They are entitled only to the amount, if any, due them under the provisions of the exchange contract relating to the leasing of the 640 acres to the Keaslers.

■ We begin with the important (and conceded) fact that the Keaslers have fully performed their agreement to convey the 640 acres with encumbrances not exceeding $82,500. Their performance of this promise, due by December 15, 1961, was late. The encumbrances on the 640 acres were not reduced to $82,500 until September, 1962. Time, however, was not of the essence of the contract. "If time is not of the essence, mere delay in performance is not considered a material breach justifying

rescission." 17A C.J.S. Contracts § 422(1), p. 520.

■ Furthermore, plaintiff Mills had full knowledge at the time he executed the exchange contract that there were encumbrances on the 2,000 acres in excess of $82,500; that it would be necessary to secure partial releases of the deeds of trust on the 640 acres or have the deeds of trust on the 2,000 acres cancelled and new ones executed on the three tracts of 560, 640 and 800 acres in such fashion that the encumbrance on the 640 acres would not exceed $82,500; that these arrangements would have to be made with the consent of the holders of the deeds of trust and that this would take time to accomplish. With this knowledge, Mills effectively contributed to Keasler's delay in performance by prematurely recording his deed to the 640 acres, or permitting it to be recorded, on October 6, 1961 instead of waiting until December 15, the date recognized in the contract as the time for the delivery of the deeds and presumably of the closing of the contract, and by refusing to reconvey to Keasler and place his deed in escrow to facilitate the reshuffling and rearrangement of the deeds of trust. Moreover, Mills granted Keasler until June 5, 1962 to straighten things out and there is some evidence that Mills was still trying to rectify the situation after June 5. "The arm of equity, however encompassing it may be, is not equal to the remedying of wrongs of which the party claiming to have been injured has full knowledge, and absolved or waived the same by thereafter continuing in and consummating the transaction in which they are alleged to have been committed." Stockton v. Minkin, Mo. Sup., 276 S.W. 374, 379. Having frustrated performance, contributed to the delay, and extended the time in an effort to straighten out the title Mills is in no position to complain of the delay and has no right to rescission on the ground of Keasler's untimely performance. Mills' conduct entitled Keasler to a reasonable time after December 15 within which to comply with the requirements of the contract, Wentzel v. Lake

Lotawana Development Co., 226 Mo.App. 960, 48 S.W.2d 185, 197[19]; Motor Port v. Freeman, Mo.App., 62 S.W.2d 479, 481 [2], and under the circumstances Keasler did not take an unreasonable amount of time.

■ Nor are plaintiffs entitled to the substantial damages sought for breach of contract. Plaintiffs have shown no damages resulting from the failure of the Keaslers to reduce the encumbrances to $82,500 prior to September, 1962. As indicated, the delay was consented to by Mills as far into the year 1962 as June 5. Plaintiffs have not shown how or in what manner the 3 or 4 month delay beyond June 5, 1962, when Keaslers finally performed, actually prejudiced or damaged them. Under the instant facts the damages do not include the amount of the real estate commission, the Keasler note and Mills' equity in the motel property, as the Mills claim. If there had been a total failure of consideration the Mills might have established these items as the measure of damages but there was no failure of consideration. The Mills got what they bargained for: a 640 acre tract of land subject to encumbrances of $82,500.

The only way in which it appears that the Mills may have sustained damages is in connection with the leasing arrangements. The petition counted upon an annual rental of $14,350 for two years beginning January 1, 1962 and an agreement that the $30,650 note was to serve as a set-off against the amounts reserved for rentals, but we have not found these to be the facts. We have found that Mills' agreement was to lease the 640 acres to Keasler in consideration of the payment by Keasler of the installments of principal and interest on the $82,500 and $31,650 notes as they came due and the payment of the insurance and taxes on the land during the continuance of the lease. There is no evidence that Keasler paid the rent thus reserved, and in all justice and fairness the cause should be remanded for a hearing on the amount if any the Keaslers

owe the Mills under the lease, and the entry of an appropriate judgment on this issue.

*As to the defendant Hampton:* Plaintiffs' claim for damages against Hampton, the subject of the last two points in their brief, is based upon the theory that Hampton made false and fraudulent misrepresentations to the plaintiffs, relied upon to their damage, and that Hampton acted as real estate broker for both parties to the transaction without obtaining plaintiffs' consent thereto, thus representing adverse interests.

■ Plaintiffs are not entitled to recover damages against Hampton on the ground of the allegedly false and fraudulent representations that it was not necessary for the Mills to have the abstracts of title examined or "run the title" on the 640 acre farm because Keasler was a man of great wealth and had "plenty of money." Even if this representation was made, and was false, and was relied upon by the Mills, there could be no recovery against Hampton on this basis for the reason that there is nothing to show that the Mills would have been damaged thereby. A title search would have shown encumbrances then totalling $167,000, but Mills was already apprised of this fact. He entered into the exchange contract of October 4, 1961 with all of the knowledge about the condition of title, the amount of the encumbrances and the names of the holders of the deeds of trust that a careful examination of the abstracts of title would have revealed. The Mills could not possibly have been damaged in this respect by this representation, even if it was false. Proof of substantial injury and damage is essential to recovery in an action for fraud, Lammers v. Greulich, Mo.Sup., 262 S.W.2d 861, and where no damages are sustained as a result of the fraud charged, no action for damages may be maintained. Bales v. Lamberton, Mo.Sup., 322 S.W.2d 136. "Fraudulent representations, without injury, are not actionable." Abbott v. Miller, 226 Mo.App. 277, 41 S.W.2d 898, 900 [6].

■ Nor are plaintiffs entitled to recover damages against Hampton on the ground that he acted as a real estate broker not only for the Mills but also for the Keaslers, without the consent of the Mills so to do, on the basis that when a broker secretly acts for both parties in a transaction and serves two masters representing adverse interests he is liable for damages which may ensue. The powers of a court of equity are broad but they are limited to the claim for relief and issues made by the pleadings. Witte v. Cooke Tractor Co., Mo.App., 261 S.W.2d 651, and authorities cited l.c. 660. The defense of dual employment must be specially pleaded, Shepley v. Green, Mo. App., 243 S.W.2d 772, 777, but this petition does not plead constructive fraud based upon the alleged nondisclosure of the dual agency of Hampton. The issue of constructive fraud therefore has not been properly raised. Furthermore, Mills, prior to the execution of the exchange contract, had knowledge of the fact that Hampton was to receive a $5,000 finder's fee or commission from Keasler and acquiesced in the arrangement, even to the extent of consenting to have the amount of Hampton's fee tacked on to the amount of his note to Hampton and to have his note to Keasler reduced by the same amount. " * * * [W]hile any such agency requires the consent of each principal in order to legalize its dual character, yet, where the fact that the agent is representing two principals is known to each and they go forward with the transaction without objecting, their consent will be implied both as between themselves and as to such agent." Shepley v. Green, supra, 243 S.W.2d l. c. 777.

Accordingly, we rule that plaintiffs are not entitled to rescission of the contract of October 4, 1961; that plaintiffs are not entitled to damages against defendants Keasler for delay in performance of their agreement to convey subject to encumbrances not in excess of $82,500, and that plaintiffs are not entitled to damages against defendant Hampton. To this extent the judgment of the circuit court is affirmed.

We direct, however, that the cause be remanded for the purpose of conducting a hearing on the question of the liability, if any, of the Keaslers to the Mills under the agreement to lease the 640 acres, and for the entry of an appropriate judgment on that issue. The costs of this appeal are ordered divided equally and assessed accordingly.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.