23091

FIRST EQUITY INVESTMENT CORPORATION, Respondent v. UNITED SERVICE CORPORATION OF ANDERSON, South Carolina, Appellant.

(386 S. E. (2d) 245)

Supreme Court

*Jack F. McIntosh* and *R. Lawton McIntosh,* both of *McIntosh & Sherard,* Anderson, and *James B. Richardson, Jr.,* of *Richardson and Smith,* Columbia, *for appellant.*

*Mitchell K. Byrd* and *Dan M. Byrd,* both of *Byrd & Byrd,* Rock Hill, *for respondent.*

Heard June 7, 1989.

Decided Oct. 3, 1989.

HARWELL, Justice:

This case involves the operation of partial land release provisions accompanying a mortgage assumption agreement and the measure of damages appropriate upon the rescission of the agreement incident to its breach. We affirm in part and reverse in part.

## FACTS

In 1985, Appellant United Service Corporation ("United") developed a subdivision near Lake Hartwell. The subdivision

consisted of 54 large lots, which United envisioned as "Mini-ranches" upon which would be built manufactured homes. This mini-ranch concept was not successful and United was unable to sell the lots. In April 1985, United sold the development to Properties Unlimited, Inc. ("Properties") and took a $333,000.00 purchase money mortgage.[1] The parties also executed a release agreement. The pertinent release provisions provided:

> A. Upon the written request of Mortgagor, Mortgagee will release portions of the within property upon the payment of Three Thousand Three Hundred Fifty and no/100 ($3,350.00) Dollars per acre, upon tender of release price.
> B. Mortgagee agrees not to unreasonably withhold such releases as are requested when release price is tendered.

After purchasing the land, Properties placed a model home on Lot #1, near the entrance, to serve as a sales model. Thereafter, Properties was unsuccessful in selling the lots. Properties determined that a smaller lot size might boost sales and further subdivided the development to increase the number of lots from 54 to 78. The lots still did not sell.

In March 1986, Respondent First Equity Investment Corporation ("First Equity"), owned by Ben and Linda Williamson, purchased the development from Properties and assumed the United mortgage. First Equity became sole owner and developer of the land. United's only interest was as a lienholder. After purchasing the land, First Equity made a number of improvements, including landscaping, adding a sign and split-rail fence at the entrance, adding vinyl siding and a porch to the model home and installing two more model homes. Despite these improvements, only one lot was sold. First Equity determined that the large size resulted in an over priced lot. Consequently, First Equity decided to create smaller lots to target the mobile home buyer's market. Ben Williamson of First Equity testified that he approached a United executive, Mr. Fred Tolly, with the idea to further subdivide the lots and hold a large auction. Williamson further testified that Tolly gave his approval.

---

[1] United retained ownership of one lot.

A new survey was completed which included 101 lots. Carolina Auction Company was hired and a large promotion was planned and advertised widely by the distribution of 17,000 brochures. Both Tolly and another United representative admitted receiving the brochures which clearly depicted the 101 lot plan. The two testified, however, that they did not notice the newly drawn lots. Representatives from the auction company met with Tolly and determined that United would cooperate. A representative of the auction company testified that it was company policy to investigate the status of mortgaged property to determine the amount and terms of release provisions. Two of the auctioneers testified that they accompanied Tolly on a driving tour of the subdivision, at times pointing out lots which had been resubdivided. The two further testified that they had no question but that Tolly knew of the resubdivision. The newly subdivided plan was shown at this meeting and no objections were raised. Tolly testified, however, that he was still not aware that the lots had been resubdivided.

On May 3, 1986, the auction was held. It was well-attended and 44 lots were sold. Tolly and another United representative were present at the auction. Tolly testified that he became aware of the resubdivision during the first 20-30 minutes of the auction, but did not stop the auction because he lacked authority to do so.

Buyers at the auction received 30 day contracts of sale. Thereafter, First Equity requested that the acreage included in these 44 lots be released pursuant to the release agreement as set forth above. United refused. First Equity refunded the money deposited by the auction buyers and brought this action against United.

In its complaint, First Equity alleged several causes of action and requested relief including: (1) money damages for breach of contract; (2) money damages for breach of contract accompanied by a fraudulent act; (3) money damages for fraud and deceit; (4) rescission and incidental and consequential damages; and (5) damages for unfair trade practices.

At the beginning of the trial, First Equity informed the Court that it was selecting rescission as its remedy. After the evidence had been presented by both plaintiff and defen-

dant, the judge directed a verdict in First Equity's favor on the rescission claim, and the question of damages after the rescission went before the jury. The judge also submitted the question of United's liability on the claim for punitive damages for breach of contract accompanied by a fraudulent act. The jury returned a verdict of $170,638.76 in damages incident to the rescission and $80,000 punitive damages for breach of contract accompanied by fraud.

This appeal follows.

## I. RELEASE AGREEMENT

United argues that the judge erred in finding that First Equity was entitled to a release of the lots as requested. United contends that paragraph A of the release portion of the mortgage (set forth above) could only be construed to mean that release would occur on a "per lot" as opposed to a "per acre" basis. United further contends that the "per lot" release was to be based on the second subdivided plan as prepared by Properties setting forth 78 lots as opposed to First Equity's plan setting forth 101 lots. First Equity contends that the release provisions provided a price "per acre" on which any release was to be valued and that the release included nothing to indicate that it was restricted to a "per lot" basis pursuant to the second plan. United contends that allowing release through a valuation on a per acre basis would have resulted in impairment of its security interest because the land for which First Equity sought release was the more desirable street front acreage, leaving the less desirable rear lots as the only remaining collateral. Accordingly, United asserts that it rightfully withheld release.

While security agreements are for the benefit of the mortgagee, partial release agreements are for the benefit of the mortgagor. *Lambert v. Jones*, 540 S.W. (2d) 256, 259 (Tenn. App. 1976). "[Such] clauses are bargained for by the borrower and are paid for by him in one manner or the other. Therefore, [there is] no reason ... for such clauses to be construed as if they were designed to protect the lender." *Id.* If a mortgagee intends to retain control over the parcels selected for release, additional words indicating that intention should be set forth in the agreement. *Leisure Campground & Country Club Limited*

*Partnership v. Leisure Estates*, 280 Md. 220, 228, 372 A. (2d) 595, 600 (Md. App. 1977). When, however, the release is silent as to which party may select parcels to be released, it is implied that the mortgagor has this right. Here, the release agreement did not provide United with authority to choose which lots were acceptable for release. Further, the agreement did not include any reference to a particular subdivision plan. The right to select lots for release belonged to First Equity.

Further, we are not persuaded by United's argument that it had a right to refuse release on the basis of impairment of its collateral. Even accepting this as a viable defense, United failed to introduce evidence to support this claim because it introduced nothing to show that the remaining lots were not saleable or lacked value.

We hold that the release provision, which was not drafted on a "per lot" as opposed to a "per acre" basis, and which included no restriction on release, nor reserved power in United to choose lots to be released, entitled First Equity to release of the lots as requested.

## II. DAMAGES

### A. RESCISSION DAMAGES

The judge allowed First Equity to submit evidence of expenses from the time of the mortgage assumption forward. United contends that this was error, and that only evidence of expenses connected with the auction should have been submitted to the jury. We disagree.

When a party elects and is granted rescission as a remedy, he is entitled to be returned to status quo ante. *Kent Homes, Inc. v. Frankel*, 128 A. (2d) 444, 446 (D.C. App. 1957). Rescission entitles the party to a return of the consideration paid as well as any additional sums necessary to restore him to the positions occupied prior to the making of the contract. *Bank of Johnston v. Jones*, 141 S. C. 98, 115-116, 139 S. E. 190, 196 (1927); *Baeza v. Robert E. Lee Chrysler, Plymouth*, 279 S. C. 468, 472-473, 309 S. E. (2d) 763, 766 (Ct. App. 1983); *Jennings v. Lee*, 461 P. (2d) 161, 167 (Ariz. 1969). In order to be placed in status quo ante, First Equity was entitled to recover costs incurred from the entry into the contract forward. The award of $170,638.76 in rescission damages was

supported by the evidence of record. We see no error in allowing the submission to the jury of all costs incurred in reliance on both the release provisions as well as the subsequent actions and assurances of United that it would comply with the provisions. We therefore affirm the rescission damages award.

## B. PUNITIVE DAMAGES

Counsel for First Equity stated at the start of the trial that "[i]n regards to the remedies, we are electing to rescind." Because First Equity voluntarily chose rescission as its remedy, we make no comment as to whether, under South Carolina law, First Equity was required to so elect at the beginning of trial or at some other stage. On appeal, United argues that, because First Equity chose rescission, it was not also entitled to submit the question of punitive damages for breach of contract accompanied by a fraudulent act. We agree.

As a general rule, a defrauded party to a contract has a choice of remedies; he may rescind the contract and recover what he has paid, or he may affirm the contract and recover damages. *Turner v. Carey*, 227 S. C. 298, 305, 87 S. E. (2d) 871, 874 (1955). "A rescission disaffirms the contract but an action for damages affirms the contract. An action on one theory must allege what an action on the other theory must deny and so is opposite to the other." *Timmons v. Bender*, 601 S. W. (2d) 688, 690 (Mo. App. 1980) citing *Mills v. Keasler*, 395 S. W. (2d) 111, 116 (Mo. 1965). A defrauded party is not allowed to rescind in part and affirm in part—he must do one or the other. *Parker v. White*, 235 N. C. 680, 688, 71 S. E. (2d) 122, 128 (1952). The election of rescission does not bar the rescinding party from receiving damages to make the party whole, but prevents him from receiving damages that presuppose a valid contract. *Landin v. Ford*, 727 P. (2d) 331, 332 (Ariz. 1986).

Here, First Equity, on the one hand, seeks rescission of the contract and return to status quo ante, a position which denies the existence of the contract. On the other hand, First Equity also seeks damages for breach of contract accompanied by a fraudulent act, a position which affirms the contract.

This Court addressed a similar situation in *Turner v. Carey, supra,* in which a defrauded purchaser sought both damages for fraud and deceit and a cancellation of the contract. The trial judge in *Turner* had erroneously ruled that a verdict for damages for fraud and deceit vitiates any contract in which a purchaser has entered. In addressing this error, we held that while it is true that an action in rescission, or to set aside a transaction for fraud, would result in cancellation of the contract, the bringing of a cause of action for fraud and deceit is an affirmation of the contract. This Court further stated: "that [t]he two remedies are inconsistent, the one being based on the continued existence of the sale, the other on its abrogation ..." 227 S. C. at 305, 87 S. E. (2d) at 874. Similarly, we see an action for breach of contract, accompanied by a fraudulent act as based on an abrogation of the contract. Accordingly, a party who has elected a remedy which abrogates the contract cannot also choose another remedy which affirsm the contract.

First Equity, having chosen to rescind the contract, is barred from thereafter affirming the contract for the purposes of recovering for breach accompanied by a fraudulent act. Accordingly, while we affirm the rescission damage award of $170,638.76, we hold that the trial court erred in submitting the issue of breach of contract accompanied by a fraudulent act and hereby reverse the award of $80,000 in punitive damages.

Appellant's remaining exceptions are dismissed pursuant to Supreme Court Rule 23.

Affirmed in· part; reversed in part.

GREGORY, C. J., and CHANDLER, FINNEY and TOAL, JJ., concur.