544 S.E.2d 279

**BODDIE–NOELL PROPERTIES, INC., Respondent,**

v.

**42 MAGNOLIA PARTNERSHIP and
Robert Mundy, Defendants,**

**of whom 42 Magnolia Partnership is, Appellant.**

No. 3270.

Court of Appeals of South Carolina.

Heard Nov. 8, 2000.
Decided Dec. 18, 2000.
Rehearing Denied April 23, 2001.

476

Thornwell F. Sowell, A. Burns Jones, Sowell, Todd, Laffitte, Beard & Watson, Columbia, for appellant.

Mark W. Hardee, Lewis, Babcock & Hawkins, Columbia, for respondent.

ANDERSON, Judge:

In this breach of contract action, 42 Magnolia Partnership (the Partnership) appeals the trial judge's denial of its motion for judgment notwithstanding the verdict (JNOV). We affirm.

## FACTS/PROCEDURAL BACKGROUND

The Partnership developed an apartment complex in Columbia, South Carolina. In February, 1994, the Partnership borrowed $6.9 million from the Lincoln National Life Insurance Company (Lincoln) to permanently finance the complex. About four months later, Southport Financial Asset Management, Inc. (Southport) offered to purchase the complex for

$10.6 million. The Partnership and Southport entered into a purchase and sale agreement on June 23, 1994, to this effect.

The agreement was negotiated on behalf of Southport by John Parker and on behalf of the Partnership by Robert M. Mundy, Jr. Mundy is the president of Estates, Inc., which was the developer of the complex and the managing partner of the Partnership.

Pursuant to the purchase and sale agreement, Southport paid the Partnership a $100,000 earnest money deposit. In addition, as part of the deal, $100,000 of the purchase price was to be paid to Estates, Inc. in order to purchase Estates' management agreement with the apartment complex. The purchase agreement provided Southport was to assume the mortgage, which was held by Lincoln. The loan had severe prepayment penalties, plus a "favorable" interest rate. The Partnership and Southport agreed the assumption of the mortgage was an essential part of the contract.

In September of 1994, Southport assigned its rights under the purchase and sale agreement to Boddie–Noell Properties, Inc. (BNP), a publicly traded company.[1] At closing, Southport was to receive back its $100,000 deposit and $288,000 in consideration of the assignment.

The Partnership, Southport, and BNP executed a "First Amendment to Purchase and Sale Agreement," which referenced the assignment to BNP of the Southport contract, extended the closing date from September 30, 1994, to October 31, 1994, and required a $100,000 extension deposit from BNP. The amendment permitted BNP, upon written notice prior to 5:00 p.m. on September 30, 1994, to receive a refund of the extension deposit based on, *inter alia,* the failure to receive a loan assumption agreement from Lincoln. The First Amendment further provided:

In event such notice is received by the Extension Escrow Agent, this First Amendment will be null and void; provided, however, that the parties hereto agree that in such event, (1) the Purchase Contract shall remain in full force and effect, (ii) the parties hereto shall comply with the

---

1. BNP was going through a corporate restructuring during this time and is sometimes referred to in the record as BT Venture Corporation.

terms and conditions thereof, (iii) the Buyer shall remain obligated to perform all duties and obligations of the Buyer under the Purchase Agreement, and (iv) if the purchase and sale contemplated by the Purchase Agreement is not closed by September 30, 1994, such failure to close shall constitute a default under the Purchase Contract and the original Deposit shall remain non-refundable and the Buyer's (or Assignee's) right to purchase under the Purchase Contract shall be null and void; provided further, that after 5:00 p.m. on September 30, 1994, if no demand has been received by the Extension Escrow Agent, the Extension Deposit shall be fully non-refundable and the Purchase Contract shall remain in full force and effect as modified and amended by this First Amendment.

Bubba Ross, with Fleet Financial, Lincoln's servicing agent, instructed Southport by letter not to directly contact Lincoln or Fleet. Parker testified: *"[T]hat letter ... pretty well said all information about the assumption of the loan and the potential borrower was to flow through Estates, Inc., or 42 Magnolia Partnership."* (Emphasis added.) Scott Wilkerson, BNP's President, stated: *"We were told from day one, long before we actually had a legal agreement in place, that we had to go through Bob Mundy, that we were specifically not to contact Lincoln—initially, we didn't know about Fleet. Later we heard Fleet was the servicing agent—that we had to go through Bob Mundy."* (Emphasis added.) Mundy acted as the "conduit" between BNP, Fleet, and Lincoln regarding Lincoln's approval of BNP's assumption of the loan. John Parker, who was authorized by Southport to act on its behalf, declared Mundy became the "mouthpiece of Lincoln."

On several occasions, Mundy inquired from Parker and Wilkerson as to the amount Southport was to receive from BNP for the assignment, referring to it as a "secret profit." Parker and Wilkerson refused to tell Mundy the terms of the assignment. Thereafter, according to Parker, Mundy acted "fishy."

Mundy told BNP that Lincoln would not agree to an assumption of the loan without a personal guaranty. Because BNP is a publicly traded corporation, a personal guaranty was impractical. Wilkerson related this information to Mundy and

expected the information to be passed on to Lincoln. When BNP offered to provide Lincoln with a copy of its bond in lieu of the guaranty, which would protect Lincoln's interests, Mundy stated: "Well, that's not good enough. They want someone to personally sign." Wilkerson "was being told [by Mundy] that Lincoln was being contacted daily and that Lincoln was adamant that there had to be individual signers."

In addition, the loan included a requirement that there be no change in ownership of the company during the term of the loan. BNP explained that as a publicly traded corporation, it could not abide by that term as BNP's ownership constantly changed with the trade of its shares of stock. Thus, BNP would immediately be in technical default upon assumption of the loan. Mundy informed BNP that Lincoln would not change any of the terms of the loan, including the limitation on changes of ownership.

Parker visited Mundy on the eve of the final day BNP could rescind the contract without forfeiting the extension deposit. Parker testified that although it was urgent BNP and Mundy resolve the problems regarding the Lincoln loan, Mundy kept Parker waiting in his reception area for an hour and a half while Mundy stayed in his office "joking around and maybe talking sports scores ... and killing time."

The following day, relying on Mundy's representations that Lincoln would not approve the assumption of the loan, BNP "terminated" the Assignment Agreement and the First Amendment to the Purchase and Sale Agreement. BNP already owed Southport $100,000 for its initial deposit, and was hesitant to deposit an additional $100,000 if the loan could not be assumed. According to Wilkerson, on September 30, he was "still being told ... [BNP] cannot assume this loan unless [BNP] provide[s] an individual, a person, not the corporation." Wilkerson stated Mundy represented that if Lincoln subsequently permitted the assumption of the loan, BNP could continue under the contract.

Wilkerson said the Partnership was meeting the following week on October 5 to discuss a solution which would enable the parties to consummate the sale. On October 6, he learned the Partnership thought it could get a higher price and decided to sell the complex to someone else. Wilkerson

contacted Calvin King, who works at Lincoln, to determine why Lincoln would not approve his company for the loan assumption. According to Wilkerson, King acted as if he had never heard of the requirement alleged by Mundy regarding a personal guarantor. The next day Wilkerson was advised Lincoln approved the loan without requiring a guarantor.

At a BNP Board of Directors' meeting on October 11, Wilkerson received the Board's approval to close on the property by October 15. When BNP attempted to get the paperwork signed for the assumption of the loan, Mundy refused to cooperate. BNP received a letter from the Partnership's attorneys, which read: "In accordance with Paragraph 1 of the First Amendment, we have received written notice from [BNP] that [BNP] terminated its obligations under the First Amendment." According to the letter, BNP's right to purchase the complex was null and void. The letter provided the Partnership was entitled to retain the $100,000 deposit delivered by Southport under the terms of the purchase agreement.

Audrey Navarre, the Fleet employee responsible for corresponding with Lincoln regarding the loan, professed she related all information from Mundy to Lincoln and vice versa. Navarre was unaware there was a September 30 deadline for the loan assumption, therefore, she never passed that information on to Lincoln. Navarre said Mundy knew Lincoln required a personal guarantor. She never told Lincoln that BNP could not provide a personal guarantor, and had offered a bond instead because she had no knowledge of that fact herself.

Calvin King testified that Lincoln would expect to be notified of any changes in a purchase agreement, such as the deadline change in the First Amendment, and would try to work with the parties regarding the change. However, King averred he did not "remember Fleet ever telling" Lincoln about the September 30 deadline. The following exchange occurred between BNP's attorney and King:

Q. Now, according to this e-mail [from Judy Litzenberg with Lincoln dated September 27th, 1994], Lincoln was being told that there would not be a personal guarantor for the carve-outs, is that true?

A. Yes, sir.

Q. And to your memory, is this the first time Lincoln was aware of that?

A. I can't remember. But just by reading this, it would make me think that that was the case.

Q. Okay. So before September 27th, 1994, you didn't know that [BNP] said no, there will not be a personal guarantor?

A. That is probably the case.

King said Lincoln was not cognizant of the fact that BNP offered a bond in place of the guarantor until King prepared for a deposition for this litigation. King declared that if Lincoln had known about the deadline, Lincoln would have tried to "accommodate that deadline." According to King, once Lincoln was informed of BNP's requirements, the loan assumption involved "a one-day approval" transaction.

BNP filed a complaint against the Partnership and Mundy, alleging causes of action for fraud, breach of contract, and breach of contract accompanied by a fraudulent act. The trial judge denied the Partnership's motion for a directed verdict and submitted the case to the jury. During deliberations, the jury sent a note to the judge stating: *"Most Important* → (1) Did Lincoln Nat. have in its possession the 1st Ammendment [sic] contract prior to Sept. 30th 1994[?]" The attorneys for the parties agreed Lincoln did not possess the First Amendment prior to September 30. The judge instructed the jury: "The question posed, the answer is no. The answer is no from the three attorneys. They all agree the answer would be no."

The jury returned a verdict for BNP on the breach of contract cause of action and awarded damages of $100,000. The Partnership filed a motion for JNOV, or in the alternative, a new trial. The judge denied the motion. The Partnership appeals.

### STANDARD OF REVIEW

 When reviewing the denial of a motion for directed verdict or JNOV, this Court must employ the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party.

*Steinke v. South Carolina Dep't of Labor, Licensing and Regulation,* 336 S.C. 373, 520 S.E.2d 142 (1999); *Welch v. Epstein,* 342 S.C. 279, 536 S.E.2d 408 (Ct.App.2000). The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt. *Welch, supra.* This Court will reverse the trial court only when there is no evidence to support the ruling below. *Creech v. South Carolina Wildlife and Marine Resources Dep't,* 328 S.C. 24, 491 S.E.2d 571 (1997). When considering directed verdict and JNOV motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence. *Welch, supra.*

A motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict. *Crossley v. State Farm Mut. Auto. Ins. Co.,* 307 S.C. 354, 415 S.E.2d 393 (1992). The jury's verdict will not be overturned if any evidence exists that sustains the factual findings implicit in its decision. *Welch, supra.*

## ISSUES

I. Did the trial court err in denying the Partnership's motion for JNOV on BNP's breach of contract claim where BNP rescinded the contract?

II. Did the trial court err in submitting BNP's breach of contract claim to the jury?

## LAW/ANALYSIS

### I. Rescission

The Partnership argues the trial judge erred in denying its motion for JNOV on BNP's claim for breach of contract because BNP rescinded the contract and, as a matter of law, damages for an alleged breach of a rescinded contract cannot be recovered. We disagree.

Rescission is an "abrogation or undoing of [a contract] from the beginning, which seeks to create a situation the same as if no contract ever had existed." *Government Employees Ins. Co. v. Chavis,* 254 S.C. 507, 516, 176 S.E.2d 131, 135 (1970). In *First Equity Investment Corp. v. United*

*Service Corp.*, 299 S.C. 491, 386 S.E.2d 245 (1989), a mortgagor brought an action against a mortgagee, alleging breach of contract accompanied by a fraudulent act and seeking the remedy of rescission. The Supreme Court explained:

> When a party elects and is granted rescission as a remedy, he is entitled to be returned to status quo ante. *Kent Homes, Inc. v. Frankel*, 128 A.2d 444, 446 (D.C.Ct.App. 1957). Rescission entitles the party to a return of the consideration paid as well as any additional sums necessary to restore him to the position occupied prior to the making of the contract. *Bank of Johnston v. Jones*, 141 S.C. 98, 115–116, 139 S.E., 190, 196 (1927); *Baeza v. Robert E. Lee Chrysler, Plymouth*, 279 S.C. 468, 472–473, 309 S.E.2d 763, 766 (Ct.App.1983); *Jennings v. Lee*, 105 Ariz. 167, 461 P.2d 161, 167 (1969).

*First Equity Investment Corp.*, 299 S.C. at 496–97, 386 S.E.2d at 248. Rescission, as a remedy, returns the parties to the status quo ante. *Government Employees Ins. Co., supra.* A return to the status quo ante necessarily requires any party damaged to be compensated. *See Ebner v. Haverty Furniture Co.*, 128 S.C. 151, 122 S.E. 578 (1924) (remedy of rescission is insufficient if parties cannot be returned to status quo ante).

Here, no issue is presented in regard to rescission being granted by the court as a remedy. Rather, this record encapsulates a factual scenario involving rescission exercised by a party when faced with a mandatory deadline. The breach of contract and resulting damages occurred before the rescission by BNP.

 When a contract provides for rescission, and is rescinded pursuant to the right thus given, the rescission does not "extinguish liabilities that have already accrued under the contract, and this is so regardless of whether the liability is that of the party who exercised the option to cancel the agreement or is the liability of the party against whom the cancellation is made." 17A Am.Jur.2d *Contracts* § 603 (1991) (footnotes omitted). Concomitantly, a voluntary cancellation of a contract under a rescission provision on account of a breach by the other party does not automatically release each party from all obligations under the contract. *Id.* Rather, "a

recovery of damages for breaches which cause the cancellation may be had." *Id.*

■ BNP's rescission did not bar BNP from seeking damages for breach of contract. Thus, the trial court did not err in denying the Partnership's motion for JNOV.

## II. Breach of Contract

■ The Partnership maintains the trial judge erred in submitting the breach of contract claim to the jury because there was no evidence to support a claim for breach of contract. We disagree.

The purchase and sales agreement provided in part:

17. *Further Assurances.* Each of the parties hereto agrees to do, execute, acknowledge and deliver and cause to be done, executed, acknowledged and delivered all such further acts, assignments, transfers and assurances as will reasonably be requested of it in order to carry out this Agreement and give effect thereto.

BNP presented overwhelming evidence from which the jury could infer that Mundy breached this provision of the agreement by withholding information from Lincoln. This provision imposed upon the Partnership a specific duty to act affirmatively to assist BNP in assuming the Lincoln loan, which was an essential term of the contract. Numerous parties testified Mundy in fact appeared to hamper BNP's efforts to assume the Lincoln loan rather than assist BNP in the assumption of the loan.

■ Furthermore, under South Carolina law, there exists in every contract an implied covenant of good faith and fair dealing. *Adams v. G.J. Creel and Sons, Inc.,* 320 S.C. 274, 465 S.E.2d 84 (1995); *Parker v. Byrd,* 309 S.C. 189, 420 S.E.2d 850 (1992). Our Supreme Court, in *Commercial Credit Corp. v. Nelson Motors, Inc.,* 247 S.C. 360, 147 S.E.2d 481 (1966), articulated:

[T]here exists in every contract an implied covenant of good faith and fair dealing. 17A C.J.S. *Contracts* § 328; 17 Am.Jur.2d *Contracts,* Sec. 255, 256; 4 *Williston on Contracts,* 3d ed., Sec. 610B; 5 Id., Sec. 670.

We quote from 17A C.J.S. *Contracts* § 328, pages 282—284:

> "A contract includes not only what is expressly stated but also what is necessarily to be implied from the language used and external facts, such as the surrounding circumstances; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face.

> "In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made. * * *"

And from 17 Am.Jur.2d *Contracts,* Sec. 255, pages 649—650:

> "* * * The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted or to have been deemed perfectly obvious by the parties, the parties being supposed to have made those stipulations which as honest, fair, and just men they ought to have made. * * *"

> "It has been said that implied promises always exist * * * where the covenant on one side involves some corresponding obligation on the other; where, by the relationships of the parties and the subject matter of the contract, a duty is owing by one not expressly bound by the contract to the other party in reference to the subject thereof. * * *"

*Commercial Credit Corp.,* 247 S.C. at 367, 147 S.E.2d at 484.

We find BNP introduced sufficient evidence the Partnership, via Mundy's efforts to thwart the closing, breached the implied covenant of good faith and fair dealing. Thus, the trial judge properly submitted the breach of contract issue to the jury.

### CONCLUSION

We hold that when a contract provides for rescission, and is rescinded pursuant to the right thus given, the rescission does not extinguish liabilities that have already accrued under the contract. This principle is efficacious regardless of whether

the liability is that of the party who exercised the option to cancel the agreement or is the liability of the party against whom the cancellation is made. We find a voluntary cancellation of a contract under a rescission provision on account of a breach by the other party does not automatically release each party from all obligations under the contract. Damages for breaches which cause the cancellation may be recovered. We conclude BNP's rescission did not bar BNP from seeking damages for breach of contract. Thus, the trial court did not err in denying the Partnership's motion for JNOV. Further, BNP presented overwhelming evidence from which the jury could infer Mundy breached the contract by withholding information from Lincoln. Therefore, the judge properly submitted the breach of contract issue to the jury. Accordingly, the trial judge's order is

**AFFIRMED.**

HEARN, C.J., and STILWELL, J., concur.