574 S.E.2d 726

**BODDIE–NOELL PROPERTIES, INC., Respondent,**

v.

**42 MAGNOLIA PARTNERSHIP and Robert Mundy, Defendants,**

**Of whom 42 Magnolia Partnership is Petitioner.**

No. 25569.

Supreme Court of South Carolina.

Heard Oct. 23, 2002.

Decided Dec. 16, 2002.

Rehearing Denied Jan. 24, 2003.

438

Thornwell F. Sowell, of Sowell Gray Stepp & Laffitte, L.L.C., of Columbia, for Petitioner.

Mark W. Hardee, of Lewis, Babcock & Hawkins, L.L.P., of Columbia, for Respondent.

Justice WALLER:

We granted a writ of certiorari to review the Court of Appeals' opinion in *Boddie–Noell Properties, Inc. v. 42 Magnolia Partnership*, 344 S.C. 474, 544 S.E.2d 279 (Ct.App.2000). We affirm as modified.

## PROCEDURAL BACKGROUND

Respondent Boddie–Noell Properties, Inc. (BNP) sued petitioner 42 Magnolia Partnership (the Partnership) and Robert Mundy[1] for breach of contract, breach of contract accompanied by fraudulent act, and fraud. At the end of trial, the trial court submitted to the jury the fraud claim against both the Partnership and Mundy and the breach of contract claim against the Partnership. The jury returned a verdict in favor of the Partnership and Mundy on the fraud action, but found in favor of BNP on the breach of contract claim. The jury awarded BNP $100,000 in damages. The trial court denied the Partnership's motion for a judgment notwithstanding the verdict (JNOV), and the Partnership appealed. The Court of Appeals affirmed, holding: (1) there was overwhelming evidence of breach of contract; and (2) damages for the breach could be recovered despite BNP's cancellation of the contract. *Boddie–Noell, supra.*

## FACTS[2]

The Partnership developed an apartment complex called 42 Magnolia in Columbia, South Carolina. In February 1994, the Partnership borrowed $6.9 million from the Lincoln National

---

1. Mundy is the president of Estates, Inc., a real estate development and management company that is also the managing partner of the Partnership.

2. The reader is directed to the Court of Appeals' opinion for an even more detailed recitation of the facts.

Life Insurance Company (Lincoln) to finance the complex. In June 1994, Southport Financial Asset Management, Inc. (Southport) and the Partnership entered into a purchase and sale agreement where Southport agreed to buy the complex for $10.5 million. Mundy negotiated the purchase agreement for the Partnership, and John Parker represented Southport. As part of the purchase agreement, Southport was to assume the $6.9 million mortgage held by Lincoln; the closing date could not be later than September 30, 1994.

In September 1994, BNP entered into a contract with Southport and the Partnership called the "First Amendment to Purchase and Sale Agreement." This contract recognized that Southport assigned its rights under the purchase agreement to BNP and extended the closing date to October 31, 1994.[3] The contract provided that BNP would pay $100,000 as an extension deposit within three days after the contract was executed. The contract further provided that BNP could, at any time prior to 5 p.m. on September 30, "demand and receive a complete refund of the Extension Deposit upon" BNP's failure to receive, *inter alia*, a loan assumption agreement from Lincoln. In the event that BNP exercised this provision, the contract would become "null and void;" the purchase agreement, however, between Southport and the Partnership would remain "in full force and effect."

Scott Wilkerson, BNP's president, explained that BNP would not have been interested in the property without the Lincoln loan because it had such a low interest rate. Therefore, the loan assumption was a crucial part of the transaction. Wilkerson testified that he was told specifically not to contact Lincoln but to go through Mundy. Parker likewise testified that Mundy "had become the mouthpiece of Lincoln." As a result, BNP and Southport were relying on Mundy to give Lincoln the information necessary to get Lincoln's approval of the loan assumption.

Thus, all the information required by Lincoln regarding the loan assumption flowed from the buyer (which initially was

---

3. Southport was going to profit $288,000 from the assignment of the purchase agreement to BNP. BNP also agreed to pay Southport $100,000 because Southport had already paid that amount as earnest money to the Partnership.

Southport and then was BNP), to Mundy, then to Fleet Funding (Lincoln's local servicing agent), and, finally, to Lincoln. Parker testified that after Southport assigned its rights to BNP, Mundy inquired about the "secret profit" Southport was going to make. When Parker refused to tell him, Mundy's behavior became "fishy" according to Parker. Nonetheless, with the September 30 deadline approaching, the parties continued to work on obtaining Lincoln's consent to BNP's assumption of the loan.

Although the loan was generally a non-recourse loan, there were certain exceptions or "carve-outs" which were personally guaranteed. For example, Lincoln required individuals to guarantee the loan for environmental liability. Mundy told BNP that Lincoln would not agree to an assumption of the loan without personal guarantors for the environmental carve-outs. However, because BNP is a publicly traded corporation, Wilkerson told Mundy a personal guaranty was not possible. BNP offered to have the company sign for the carve-outs or to provide Lincoln with a copy of its bond in lieu of individual guarantors. Wilkerson related this information to Mundy and was told that Lincoln was being contacted daily. According to Mundy, however, Lincoln insisted on individual signers for the carve-outs.

The deadline of September 30 came and, because Mundy said Lincoln would not approve the loan assumption, BNP reluctantly exercised its option under the contract to cancel. Wilkerson explained he did not want to put $200,000 of his company's money at risk without Lincoln's assurance it would consent to the loan assumption.

Nevertheless, negotiations regarding the sale of the property continued. Wilkerson could not understand why Lincoln was reluctant to approve assumption of the loan since it had closed many other insurance company loans with only the company as a guarantor. After hearing that the Partnership had a meeting on October 5 and had discussed finding another buyer at a higher price, Wilkerson decided to contact Lincoln directly. On October 6, he spoke with Calvin King of Lincoln and told him that the company would sign for the carve-outs. According to Wilkerson, King acted like he had never heard this information before. The very next day, Lincoln approved

BNP's assumption of the loan without any individual guarantors.

On October 24, the Partnership's attorney wrote BNP and Southport a letter stating that BNP had terminated the contract and because Southport did not close by September 30, pursuant to the original purchase agreement, the Partnership was entitled to keep Southport's $100,000 deposit. Negotiations apparently continued for a few more months, but neither BNP nor Southport ever purchased 42 Magnolia.

The jury found in favor of BNP on the breach of contract claim and awarded $100,000 in damages. In its JNOV motion, the Partnership argued that because the contract was rescinded, damages could not be recovered for any breach. The trial court denied the motion, and the Court of Appeals affirmed. *Boddie–Noell, supra.*

## ISSUE

Where BNP exercised its option to cancel under the contract, can BNP recover breach of contract damages?

## DISCUSSION

The Partnership argues that because BNP "rescinded" the contract, the contract was rendered "null and void;" therefore, BNP is barred from recovering damages for breach. BNP responds that the contract was not "rescinded," but instead was "canceled" pursuant to the contract terms.

Addressing the Partnership's argument that BNP had rescinded the contract, the Court of Appeals analyzed the issue as one of rescission and stated, in part, as follows:

> Rescission is an abrogation or undoing of [a contract] from the beginning, which seeks to create a situation the same as if no contract ever had existed....

> When a party elects and is granted rescission as a remedy, he is entitled to be returned to status quo ante. Rescission entitles the party to a return of the consideration paid as well as any additional sums necessary to restore him to the position occupied prior to the making of the contract....

*Boddie–Noell,* 344 S.C. at 482–83, 544 S.E.2d at 283–84 (internal quotes and citations omitted).

The Court of Appeals recognized, however, that in the instant case, "no issue is presented in regard to rescission being granted by the court **as a remedy.** Rather, this record encapsulates a factual scenario involving **rescission exercised by a party** when faced with a mandatory deadline. The breach of contract and resulting damages occurred **before** the rescission by BNP." *Id.* at 483, 544 S.E.2d at 284 (emphasis added). Therefore, the Court of Appeals looked to 17A Am. Jur.2d *Contracts* § 603 (1991), which states that:

> [W]hen a contract contains a provision or option giving the right . . . of cancellation and the contract is canceled in pursuance of the right . . . given, such cancellation does not extinguish liabilities that have already accrued under the contract, and this is so regardless of whether the liability is that of the party who exercised the option to cancel the agreement or is the liability of the party against whom the cancellation is made.

(Footnotes omitted). Accordingly, the Court of Appeals held "BNP's **rescission** did not bar BNP from seeking damages for breach of contract." *Boddie–Noell,* 344 S.C. at 483–84, 544 S.E.2d at 284 (emphasis added). Furthermore, in the opinion's conclusion section, the Court of Appeals stated: "We find a voluntary **cancellation** of a contract under a **rescission** provision on account of a breach by the other party does not automatically release each party from all obligations under the contract." *Id.* at 486, 544 S.E.2d at 285.

The Partnership contends that because there was a rescission of the contract—pursuant to the contract's own terms—the contract has become null and void. This, according to the Partnership, precludes BNP from suing for damages. We disagree.

In our opinion, what happened in this case has been mistakenly characterized as a rescission of the contract.[4] As a result, confusion has ensued about whether BNP was entitled

---

4. Admittedly, "[t]here is a confusion of vocabulary in this area." 2 CORBIN ON CONTRACTS, § 6.10 (Rev. ed.1995). "The power of 'termination' is often called the power of 'cancellation' or of 'rescission.'" *Id.*

to sue for breach of contract damages. While the Court of Appeals discussed general law on "rescission," it nonetheless correctly recognized that the contract was "cancelled" by exercising a provision within the contract itself. Thus, the Court of Appeals' ultimate reliance on the general rule enunciated in 17A Am.Jur.2d *Contracts* § 603 was, in our opinion, appropriate. This particular section applies "when a contract contains a provision or option giving the right or privilege of cancellation" which is precisely the situation in this case.

■ Accordingly, we affirm the Court of Appeals' holding that BNP could recover for breach of contract despite the fact it exercised its option to cancel under the contract. *See* 17A Am.Jur.2d *Contracts* § 603 ("such cancellation **does not extinguish liabilities that have already accrued** under the contract, and this is so regardless of whether the liability is that of the party who exercised the option to cancel the agreement or is the liability of the party against whom the cancellation is made") (emphasis added); *see also* 17B C.J.S. *Contracts* § 448 (1999) ("the exercise of a reserved power of termination will usually have prospective operation only, and it will discharge both parties from their contractual duty to perform promises that are still wholly executory, **but will not discharge the duty to make reparation for breaches that have already occurred.**") (emphasis added); 13 CORBIN ON CONTRACTS, § 1266 (Interim ed.2002) (same). We note there is no unfairness in applying this general rule because it allows recovery for breach of contract after an option to cancel is exercised **irrespective** of who the breaching party is. *Id.*

Furthermore, to hold otherwise would actually reward the Partnership for Mundy's bad behavior, i.e. the breach itself. As found by the Court of Appeals, BNP presented "overwhelming evidence" that, by withholding information from Lincoln, Mundy breached the express provisions of the purchase agreement as well as the implied covenant of good faith and fair dealing. *See Boddie–Noell,* 344 S.C. at 484–85, 544 S.E.2d at 284–85. Indeed, we concur with BNP's argument that this case presents a somewhat unusual situation because BNP was essentially tricked into canceling the contract and that it exercised its right to cancel **before it had knowledge of any breach.** Under these peculiar circumstances, to deny

BNP a remedy for the Partnership's breach clearly would be inequitable.

## CONCLUSION

Because BNP cancelled the contract pursuant to an express right of cancellation within the contract, the Court of Appeals' focus on the law of rescission was misplaced. We affirm, however, the holding that BNP's cancellation did not bar it from recovering damages for the breach that had already occurred.

**AFFIRMED AS MODIFIED.**

TOAL, C.J., MOORE, BURNETT, JJ., and Acting Justice GEORGE T. GREGORY, JR., concur.