594 S.E.2d 485

**ELLIE, INC., Appellant,**

**v.**

**Ronald R. MICCICHI, Respondent,**

**Ronald R. Miccichi and Ronco of Charleston, Inc., Respondents,**

**v.**

**Ellie, Inc., Maple Games, Inc. and Robert Stefani, Sr., Appellants.**

**No. 3741.**

Court of Appeals of South Carolina.

Heard Jan. 13, 2004.

Decided Feb. 2, 2004.

Rehearing Denied April 22, 2004.

Francis T. Draine, of Columbia, for Appellants.

Justin O'Toole Lucey, of Mount Pleasant, for Respondents.

ANDERSON, J.:

Ellie, Inc., and Ronald R. Miccichi and Ronco of Charleston, Inc., filed competing claims of breach of contract and sought a declaratory judgment on the status of the lease between the parties. The trial court denied all claims by Ellie and found Ellie had breached the lease. The court concluded the breach was accompanied by fraudulent acts and awarded actual and punitive damages,[1] Miccichi validly terminated the lease, and Stefani was personally liable under his Guaranty. We affirm.

## FACTS/PROCEDURAL BACKGROUND

Miccichi owned and ran Sports, a bar in Mount Pleasant. Robert Stefani and Miccichi entered negotiations regarding Stefani taking over the bar's operations. Stefani established Ellie, Inc., for management of the bar. Miccichi, on behalf of Ronco, and Stefani, acting for Ellie, signed a Management Agreement in July 1995, in which Ellie was hired to operate the bar. The agreement outlined the basic responsibilities and compensation to Ellie. Attached to the Agreement was an Addendum dealing with equipment rental and the installation and maintenance of video gaming machines by Miccichi. Under the Addendum, Ellie received nominal compensation for handling the daily payouts for the machines, but did not acquire any portion of the profits.

Simultaneously, Miccichi, as owner of the property, and Ellie entered into a Lease Option Agreement. Ellie was granted the option to lease and operate Sports for five years with possibilities of renewal for three five-year terms. The agreement set forth several acts of default, the failure to observe, keep and perform any of the duties contained within the lease after sixty days notice. Miccichi was given the power to extinguish the lease for default with fifteen days notice. Miccichi signed the lease, but enclosed a corporate authorization by Ronco, indicating he was the president and had authority to sign. An identical Addendum to the one

---

1. The only issues on appeal are whether: (1) the lease was validly terminated; (2) Stefani's Guaranty is enforceable; and (3) if several factual findings were supported by the evidence. Neither Stefani nor Ellie has appealed the actual award of damages as a result of the breaches by Stefani.

appended to the Management Agreement was attached to the Lease Option Agreement.

Contemporaneously, Stefani executed a Guaranty and non-compete contract. He personally guaranteed the payments required under the lease, and up to $30,000.00 in liquidated damages in the event of Ellie's default. Stefani signed the Guaranty individually and as president of Ellie.

The parties executed a first amendment on December 18, 1995, which expressly modified the Addendum to the Lease Option and Management Agreements. The amendment established Ellie's first shares of revenue from video gaming. Ronco would purchase a five-seat gaming machine and the profits would be divided. Ellie would maintain the machine and the payouts. The amendment also ratified the existing contracts and expressly enunciated that the Guaranty remained in full effect.

A second amendment on April 4, 1996, had more efficacy upon the original agreements. It altered the Lease Option Agreement to allow for installment payments of the fees in the event it was exercised. Additionally, it changed some of the equipment rental provisions. The parties agreed a second video gaming machine would be purchased and the parties would share revenues of the second machine. Finally, the amendment acknowledged that the prior agreements remained in effect.

Several months after this amendment, Stefani exercised the Lease Option. Therefore, the Management Agreement was no longer in effect. However, there is no indication Stefani was released from the Guaranty as it also applied to the financial responsibilities of Ellie under the Lease Option contract.

Ronco and Miccichi presented a third amendment on July 6, 1998, which provided Ellie a share of all the gaming machines' revenues. The amendment defined net revenues, and allocated twenty percent to Ellie. Miccichi and Ronco retained ownership of the machines, but Ellie was responsible for twenty percent of certain costs, including licenses. Additionally, Ellie was to handle daily collection of money from the machines, insure the collections, and report any problems to Ronco.

On September 28, 1998, the parties adjusted the amount of gaming proceeds being paid to Ellie, as well as allowed Ronco to lease no more than twenty percent of the building for gaming use. This fourth agreement indicated that the revenues allocated to Ellie would pass on to any sublet tenant. The agreement further established that the cost of all new machines would be paid off before any profits are distributed.

The parties next signed off on a "letter . . . for the purpose of clarifying the relationship between Ronco/Ron Micciche [sic] and Ellie/Bob Stefani with regard to the operation of video gambling machines. . . ." The agreement, dated December 2, 1998, allocated seventy-five percent of the first $500,000.00 in net revenue to Ronco. Once net revenue surpassed $500,000.00, the parties divided the revenue evenly. Ellie/Stefani continued to pay twenty-five percent of the expenses, and the parties agreed to add additional rooms onto the property for gaming. The rooms would be paid for seventy-five percent by Ronco and twenty-five percent by Ellie. The agreement included a provision, which made the terms transferable with Ronco having the right of first refusal on any offer. Finally, the contract included a provision, which read: "This agreement is binding on Ellie and Ronco and replaces any previous agreement(s) between these parties."

The final amendment on May 1, 1999 introduced a new company, Maple Games, Inc., into the collection of money and sharing of revenues. Maple was owned and operated by Stefani. The amendment continued the $500,000.00 revenue threshold and split Stefani's share between Maple and Ellie. The amendment also included a provision allowing for a higher share of revenue for Stefani in the summer months. The provision was not contained in the previous amendment. Finally, the amendment defined net revenue as total income less total payouts and Miccichi wrote in "less expenses!" that was not objected to by Stefani prior to Miccichi signing.

The parties' disagreements centered around the video gaming and their sharing of revenues. In October 1999, Stefani claimed the revenues had reached the $500,000.00 level at which time the revenues were split evenly. Miccichi wanted an accounting to verify the revenue figures, and claimed Stefani excluded expenses, which should have reduced the net

revenues. After reviewing the reconciliation, Miccichi identified two "phantom entries" on dates where he knew no reconciliation had been performed because he and his daughter were out of the country on vacation.

In striving to analyze the reports, Miccichi requested additional information to support the figures. Miccichi also attempted to retake control of the collection process. He sent a locksmith to the premises to change the locks on the machines, but Stefani refused the locksmith admittance.

Furthermore, the parties disputed the meaning of the "merger clause" in the letter clarifying their relationship. Miccichi sent a letter asking Stefani's opinion regarding the status of the lease. An additional letter was sent in which his counsel stated: "If [Stefani] has not vacated the property within thirty days, we will take it as a confirmation that the current lease document . . . is still in full force and effect . . . and that the only modifications that have potentially occurred to the lease are purely with regards to gaming provisions." Stefani's counsel responded, "[T]he applicability and effect of the clause will have to be determined on a case by case basis if, and when, a conflict arises between two competing agreements."

Miccichi's counsel responded by letter indicating that it was his belief the merger clause superseded the lease, and the tenancy was considered month to month. Alternatively, he stated that to the extent the lease was valid, he placed Stefani on notice regarding the violations of the gaming provisions and the refusal to allow the locks of the machines to be changed. Miccichi then gave notice that the lease would be terminated.

Approximately a month later, Ellie notified Miccichi that it sought to assign the lease to another corporation. Miccichi, through his counsel, denied the requested assignment. Ellie then initiated this lawsuit.

Ellie proceeded to trial on four main causes of action. Ellie sought a declaratory judgment that the lease was valid and Miccichi improperly denied its assignment of the lease. It claimed damages for breach of contract and in the alternative breach of contract with fraudulent intent. Its final cause of action alleged Miccichi interfered with a prospective relation-

ship. Miccichi answered, denying all of Ellie's claims, and filed a counterclaim for breach of contract accompanied by fraudulent intent and a declaratory judgment that the lease was validly terminated and his denial of the validity of the assignment was valid. The case was referred to the master-in-equity by consent of the parties.

At trial, Miccichi presented evidence of five financial irregularities regarding the collection of the gaming money. He asserted there were incorrect tabulations of when the threshold level was met, unaccounted periods where the machines were reset, errors in determining the percentage allotted to Stefani, failure to properly include all expenses in calculation of net revenue, and phantom entries.

Stefani claimed the violations of the gaming agreements were insufficient to be considered a breach of the lease. Additionally, he maintained the parties to the lease were different, and therefore the lease was a separate document from the gaming agreements.

The Master denied all of Ellie's claims and found in favor of Respondents on the counterclaims. The Master concluded the Lease Option agreement, the video gaming Addendum, and the numerous amendments all formed one contract. The Master ruled that the parties were all the same even if they were referred to as different names. The Master noted that some contracts referred to the parties one way and others used different titles to denote the same party.

The Master ruled Ellie concealed money and violated the agreement by not reporting the errors and in trying to inflate the revenues. He found Ellie breached the provisions of the agreement and the breach was accompanied by fraud in Stefani's failure to report the additional money in Ellie's possession. The Master awarded Respondents $47,164.00 in gaming revenues owed to them under the contract. Respondents were awarded $60,000.00 in double rent based upon Ellie's occupancy of the premises beyond the termination of the lease. The Master awarded $46,984 in punitive damages on the breach of contract accompanied by fraudulent intent claim. The total actual and punitive damages award was $154,148.00. Additionally, he awarded $73,319.00 in attorney's fees under the contract. The Master also found Respondents

were entitled to a verdict up to $30,000.00 against Stefani individually based on his Guaranty.

Finally, the Master held the breaches of the video gaming provisions were breaches of the Lease Agreement, and therefore Miccichi's termination of the lease was valid and justified. The Master determined Miccichi properly denied Ellie the right to assign the lease as it had been terminated. The Master ruled in the alternative that because all of the amendments related to the Lease contract in addition to the video gaming provisions, the merger clause extinguished the lease. Therefore, the Master concluded the tenancy was month-to-month and the notice provided by Miccichi was sufficient to terminate the tenancy.

## ISSUES

I. Did the Master err in ruling the contract between the parties in existence in 1999 when their dispute arose consisted of the Lease Agreement, the Addendum, and all the amendments?

II. Did the Master err in finding sufficient evidence to terminate the Lease?

III. Did the Master err in holding Stefani personally liable for up to $30,000.00 pursuant to his personal Guaranty?

IV. Did the Master err in finding Ellie and Stefani concealed income from the video gaming machines?

V. Did the trial court err in not applying the doctrines of laches, equitable estoppel, or waiver to the issue of the breaches of the video gaming portions of the contract?

## STANDARD OF REVIEW

■■ "An action for breach of contract seeking money damages is an action at law." *R. & G. Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 430, 540 S.E.2d 113, 117 (Ct.App.2000); *accord Sterling Dev. Co. v. Collins*, 309 S.C. 237, 240, 421 S.E.2d 402, 404 (1992); *Kuznik v. Bees Ferry Assocs.*, 342 S.C. 579, 589, 538 S.E.2d 15, 20 (Ct.App. 2000). "In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings.... The judge's findings

are equivalent to a jury's findings in a law action." *Townes Assocs. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976); *accord Cohens v. Atkins*, 333 S.C. 345, 347, 509 S.E.2d 286, 288 (Ct.App.1998); *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 461, 494 S.E.2d 835, 841 (Ct.App.1997).

## *LAW/ANALYSIS*

### I. The Contract

■ Ellie and Stefani maintain the video gaming agreements were separate and distinct from the Lease Option Agreement. They attest the parties and the subject matter of the contracts were dissimilar. We disagree.

The initial contract was the Lease Option with the Addendum. The Addendum included all the video gaming provisions as well as the parties' responsibilities with regard to collections of money from the machines. The Addendum was specifically incorporated into the Lease Option Agreement by paragraph seven:

> The attached addendum regarding equipment, repairs, taxes, insurance warranties and indemnity is hereby incorporated by reference as if set forth herein. For an obligation which pre-existed the exercise of this lease option, said obligations shall be deemed a pre-existing or continuing obligation, as appropriate and not a new one.

The parties to the Lease Option were Miccichi, as owner of the property, and Ellie, as the tenant. Miccichi signed the Lease Option as President of Ronco. The parties to the Addendum were the same.

The first and second amendments to the contract both specifically recognized the changes were being made to the Addendum and that the Lease Option continued in full effect. These amendments added video gaming machines and split their revenues between Ellie and Ronco. Additionally, the second amendment made alterations to the payments in the event Ellie exercised its option. Clearly both of these contracts were amendments to the original transaction and constituted a single agreement between the parties.

The July 1998 amendment does not expressly sever the Addendum from the Lease Agreement. At this time, Ellie

had executed its option and was formally leasing the premises. This amendment allocated a portion of all game revenue to Ellie, and not just revenue from the two machines in the previous amendments. It allowed Ronco to place the machines in any of three locations within its discretion. This provision alters paragraph four of the Addendum.

Moreover, this amendment specifically stated either party could terminate it and then the parties would "[return] to the agreement in the contract between the two above parties [Ronco and Ellie]." The only contract left to return to was the Lease with the Addendum. This July 1998 amendment changed the provisions established in the previous two amendments as well as provisions of the Addendum. As such, it is read as part of one contract between Miccichi, Ronco, and Ellie.

The September 1998 amendment adjusted the definition of the demised premises and altered Lease provisions if necessitated by state gaming laws. The amendment contained a provision allowing Ellie to transfer the gaming revenues to a subtenant. The parties to this amendment were Miccichi for Ronco and Stefani for Ellie. Again, this amendment is tied to the Lease and Addendum and is not read as a separate contract.

The December 2, 1998, letter was "for the purpose of clarifying" the parties' relationship. It altered video gaming provisions, such as the amount of revenue paid, *and* changed Lease provisions. The parties modified the equipment rental provisions of the Addendum. Finally, the parties agreed to add rooms to the premises for gaming, and varied the monthly rental costs accordingly. The parties to the letter were listed as "Ronco/Ron Micciche [sic] and Ellie/Bob Stefani." Unequivocally, the parties considered themselves and their corporations as one for purposes of the contracts and amendments. It is impossible to hold that this is a separate contract and not an amendment to the original Lease and Addendum.

The final amendment brought in Maple Games as another of Stefani's corporations. While this agreement only modifies the way in which revenue from the games was split, it specifically recognized "Ellie, Inc. (Robert J. Stefani, operator of SPORTS Bar and Grill) is a party to an agreement between

itself and Ronco of Charleston (Ronald Micciche [sic], owner of Ronco). . . ." The final amendment expressly stated that the previous agreement remained in effect.

In South Carolina, two contracts executed at different times relating to the same subject matter, entered into by the same parties, are to be construed as one contract and considered as a whole. *Café Assocs., Ltd. v. Gerngross,* 305 S.C. 6, 10, 406 S.E.2d 162, 164 (1991); *Moshtaghi v. Citadel,* 314 S.C. 316, 321, 443 S.E.2d 915, 918 (Ct.App.1994) (citing *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.,* 268 S.C. 80, 88, 232 S.E.2d 20, 25 (1977)). "The date of the writings constituting the transaction is not material." *Moshtaghi,* 314 S.C. at 321, 443 S.E.2d at 918 (citing *Cafe Assocs., Ltd. v. Gerngross,* 305 S.C. 6, 10, 406 S.E.2d 162, 164 (1991)); *Plaza Dev. Servs. v. Joe Harden Builder, Inc.,* 294 S.C. 430, 433–34, 365 S.E.2d 231, 233 (Ct.App.1988) ("Where instruments are entered into by the same parties at different times but relate to the same subject matter, the instruments will be construed together to determine the entire agreement between the parties."). Moreover, where one of the contracts explains, amplifies, or limits the other, those provisions will be given effect between the parties so that the whole agreement, as actually contracted by the parties, may be effectuated. *Moshtaghi,* 314 S.C. at 321, 443 S.E.2d at 918; *Edward Pinckney Assocs., Ltd. v. Carver,* 294 S.C. 351, 354, 364 S.E.2d 473, 474 (Ct.App.1987) ("Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect between the parties so that the whole agreement as actually made may be effectuated."); *See Wilbur Smith & Assocs. v. Nat'l Bank of South Carolina,* 274 S.C. 296, 299, 263 S.E.2d 643, 645 (1980) (finding two instruments must be read together to determine the whole agreement and intent of the parties where the broker and property owner entered into two exclusive listing agreements, the first of which provided that the sale price was to be mutually agreed upon after completion of a feasibility study and provided that the contract was binding on heirs and assigns, and the second of which set the sale price but made no reference to heirs and assigns). One contract draws contractual sustenance from the other. *Edward Pinckney*

*Assocs.*, 294 S.C. at 354, 364 S.E.2d at 474. This rule applies even where the parties are not the same, if the several instruments were known to all the parties and were delivered the same time to accomplish an agreed purpose. 17A Am. Jur.2d *Contracts* 388 (1991).

In construing a contract, the primary objective is to ascertain and give effect to the intention of the parties. *D.A. Davis Constr. Co., Inc. v. Palmetto Props., Inc.*, 281 S.C. 415, 418, 315 S.E.2d 370, 372 (1984) *Williams v. Teran, Inc.*, 266 S.C. 55, 59, 221 S.E.2d 526, 528 (1976); *RentCo., a Div. of Fruehauf Corp. v. Tamway Corp.*, 283 S.C. 265, 267, 321 S.E.2d 199, 201 (Ct.App.1984); *see Mishoe v. Gen. Motors Acceptance Corp.*, 234 S.C. 182, 188, 107 S.E.2d 45, 47 (1958) ("Contracts should be liberally construed so as to give them effect and carry out the intention of the parties."). The parties' intention must, in the first instance, be derived from the language of the contract. *Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003); *Jacobs v. Service Merch. Co.*, 297 S.C. 123, 375 S.E.2d 1 (Ct.App.1988); *see Thomas–McCain, Inc. v. Siter*, 268 S.C. 193, 197, 232 S.E.2d 728, 729 (1977) (Where the agreement in question is a written contract, the parties intention must be gathered from the contents of the entire agreement and not from any particular clause thereof.); *Barnacle Broad., Inc. v. Baker Broad., Inc.*, 343 S.C. 140, 147, 538 S.E.2d 672, 675 (Ct.App.2000) ("The primary test as to the character of a contract is the intention of the parties, such intention to be gathered from the whole scope and effect of the language used."). If its language is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required and the contract's language determines the instrument's force and effect. *Jordan v. Security Group, Inc.*, 311 S.C. 227, 230, 428 S.E.2d 705, 707 (1993); *Blakeley v. Rabon*, 266 S.C. 68, 72, 221 S.E.2d 767, 769 (1976). "Where an agreement is clear and capable of legal interpretation, the courts only function is to interpret its lawful meaning, discover the intention of the parties as found within the agreement, and give effect to it." *Heins v. Heins*, 344 S.C. 146, 158, 543 S.E.2d 224, 230 (Ct.App.2001). The court must enforce an unambiguous contract according to its terms, regardless of the contracts wisdom or folly, or the parties failure to guard their rights

carefully. *Ellis v. Taylor,* 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994). To discover the intention of a contract, the court must first look to its language—if the language is perfectly plain and capable of legal construction, it alone determines the documents force and effect. *Superior Auto. Ins. Co. v. Maners,* 261 S.C. 257, 263, 199 S.E.2d 719, 722 (1973).

However, where an agreement is ambiguous, the court should seek to determine the parties intent. *Smith–Cooper v. Cooper,* 344 S.C. 289, 295, 543 S.E.2d 271, 274 (Ct.App.2001); *Prestwick Golf Club, Inc. v. Prestwick Ltd. P'ship* 331 S.C. 385, 390, 503 S.E.2d 184, 187 (Ct.App.1998). A contract is ambiguous when it is capable of more than one meaning or when its meaning is unclear. *Bruce v. Blalock,* 241 S.C. 155, 160, 127 S.E.2d 439, 441 (1962). In ascertaining intent, the court will strive to discover the situation of the parties, along with their purposes at the time the contract was entered. *Klutts Resort Realty, Inc.,* 268 S.C. at 89, 232 S.E.2d at 25; *Bruce,* 241 S.C. at 161, 127 S.E.2d at 442; *Mattox v. Cassady,* 289 S.C. 57, 61, 344 S.E.2d 620, 622 (Ct.App.1986). Parties are governed by their outward expressions and the court is not at liberty to consider their secret intentions. *Blakeley,* 266 S.C. at 73, 221 S.E.2d at 769; *accord Kable v. Simmons,* 217 S.C. 161, 166, 60 S.E.2d 79, 81 (1950).

We hold the parties to the various agreements and amendments considered their relationship as one transaction with a series of amendments. They did not evidence intent to separate the video gaming provisions as originally found in the Addendum from the Lease provisions. The trial court correctly found the various writings between the parties were all construed together to constitute the contract they were bound to at the time of their dispute.

## II. Termination of Lease

As we have construed all the various writings of the parties as one contract, we must determine whether the trial court correctly found Ellie's actions with regard to the gaming revenues constituted a sufficient breach to terminate the lease. Ellie and Stefani argue the breaches of the video gaming provisions were inadequate to justify termination of the lease. We find there were significant breaches of the video gaming

provisions as well as other lease provisions, which warranted termination of the lease.

Rescission is an abrogation or undoing of [a contract] from the beginning, which seeks to create a situation the same as if no contract ever had existed. *Govt. Employees Ins. Co. v. Chavis,* 254 S.C. 507, 516, 176 S.E.2d 131, 135 (1970); *Boddie–Noell Props., Inc. v. 42 Magnolia Pship.,* 344 S.C. 474, 483, 544 S.E.2d 279, 283 (Ct.App.2000). When a party elects and is granted rescission as a remedy, he is entitled to be returned to status quo ante. *First Equity Inv. Corp. v. United Serv. Corp.,* 299 S.C. 491, 496, 386 S.E.2d 245, 248 (1989). Rescission entitles the party to a return of the consideration paid as well as any additional sums necessary to restore him to the position occupied prior to the making of the contract. *Bank of Johnston v. Jones,* 141 S.C. 98, 115–16, 139 S.E. 190, 196 (1927); *Boddie–Noell Props.,* 344 S.C. at 483, 544 S.E.2d at 283. Rescission, as a remedy, returns the parties to the status quo ante. *Government Employees Ins.,* 254 S.C. at 516, 176 S.E.2d at 135. A return to the status quo ante necessarily requires any party damaged to be compensated. *Boddie–Noell Props.,* 344 S.C. at 483, 544 S.E.2d at 284.

"The general rule is that for a breach of contract to warrant rescission, the breach must be so fundamental and substantial as to defeat the purpose of the contract." *Gibbs v. G.K.H., Inc.,* 311 S.C. 103, 105, 427 S.E.2d 701, 702 (Ct.App. 1993); *accord Elliott v. Snyder,* 246 S.C. 186, 191, 143 S.E.2d 374, 375 (1965). "[A] rescission will not be granted for a minor or casual breach of a contract, but only for those breaches which defeat the object of the contracting parties." *Rogers v. Salisbury Brick Corp.,* 299 S.C. 141, 143–44, 382 S.E.2d 915, 917 (1989).

Under South Carolina Code section 27–37–10 (1991), [t]he tenant may be ejected upon application of the landlord or his agent when (1) the tenant fails or refuses to pay the rent when due or when demanded, (2) the term of tenancy or occupancy has ended, or (3) the terms or conditions of the lease have been violated. [T]he majority of courts hold that to justify forfeiture, the breach must be material, serious, or substantial. *Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994). As held in *Kiriakides,*

"the landlord's right to terminate is not unlimited and that the court's decision to permit termination must be tempered by notions of equity and common sense." *Id.* at 276, 440 S.E.2d at 366. The court continued: "[W]e hold that a forfeiture for a trivial or immaterial breach of a commercial lease should not be enforced." *Id.* The *Kiriakides* court adopted the standards articulated in *Restatement (Second) of Contracts* § 241 (1981) for determining whether the breach of a commercial lease is trivial or immaterial:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated [by damages] for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Kiriakides*, 312 S.C. at 276, 440 S.E.2d at 366–67 (quoting *Restatement (Second) of Contracts* § 241 (1981)).

Ellie and Stefani do not seem to argue the trial court erred in finding them in breach of the video gaming provisions. Clear evidence is in the record that Ellie failed to properly report revenues and that two phantom entries into the revenues resulted in an increase in the total revenue. Additionally, Stefani admitted he miscalculated the amount he was entitled to by adding an additional five percent in months for which it was not provided in the contract.

The main areas of contention center around the alleged resets of the video gaming machines and the failure to include certain expenses. At trial, much of the time and testimony was spent detailing the resets of the machines and the proba-

ble causes for the resets. Stefani maintained the resets were caused by mechanical failures or lightning strikes.

Miccichi presented an expert in the video gaming technology, who testified the machine resets were not a consequence of lightning strikes, but had to be the result of a deliberate reset of the machine. Additionally, he professed the printout detailing the money collected would show substantial differences, such that anyone would have known a reset occurred. The Master had sufficient evidence to demonstrate Stefani knew or should have known of the resets and that Stefani did nothing to prevent them or to communicate them to Miccichi.

Stefani had a duty to report any of the problems with the machines immediately to Miccichi. He could not retain the money that was collected above and beyond what he was entitled to under the agreement. Stefani knew Ellie had more money on hand due to the phantom entries, the miscalculations, and most notably the machine resets. Instead of presenting the discrepancies to Miccichi, Ellie kept the money without Miccichi's knowledge or authorization. This was in violation of Miccichi's trust and at least one provision of their contract.

Miccichi contends there were other breaches, albeit minor ones, of the contract that when taken in total would provide justification for cessation of the lease. Stefani failed to properly insure Sports and its equipment as required by the Lease, list Miccichi as an insured on the policy, and account for repair money.

Miccichi testified that on several occasions he requested Stefani provide proof of sufficient insurance. He averred he was not provided evidence and could not obtain it from the insurance agent. Stefani's insurance agent professed that the value of the policy on Sports was only $400,000.00 until right before the time for trial when Stefani called to change it to the required $600,000.00.

The breaches of the gaming portions of the contract were significant. Miccichi presented evidence that Ellie knew it had excess cash on hand and failed to report it to Miccichi. This omission was a breach of their agreement requiring monies be turned over to Miccichi and mandating the reporting of any irregularities in the machines. In addition to the

gaming violations, Miccichi provided evidence that neither Stefani nor Ellie was providing sufficient insurance on Sports as ordered by the Lease. Accordingly, we find there was sufficient evidence to support the Master's finding that termination of the lease was proper.

### III. Guaranty

██ Stefani maintains the Master erred in finding him personally liable for $30,000.00 of the damages pursuant to his Guaranty signed at the same time as the lease. He first argues that Miccichi and Ronco did not plead the Guaranty. Additionally, he asserts the Guaranty was no longer in existence.

Ronco and Miccichi brought their counterclaim against Ellie, Maple Games, and Stefani individually. While it is true the Guaranty was not specifically listed as grounds for recovery in Respondent's pleadings, the issue was tried by consent of the parties. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 15(b), SCRCP; *accord Cheap–Os Truck Stop, Inc. v. Cloyd*, 350 S.C. 596, 608, 567 S.E.2d 514, 520 (Ct.App.2002) ("A cardinal rule of law in South Carolina edifies: When issues not raised in the pleadings are tried by consent, they will be treated as if they had been raised in the pleadings."); *Woods v. Rabon*, 295 S.C. 343, 347, 368 S.E.2d 471, 474 (Ct.App.1988) ("If neither party timely objects to evidence raising issues not pleaded, each is deemed impliedly to consent to the trial of such issues.").

Stefani and Ellie included the Guaranty in their complaint and introduced it at trial. No objection was made regarding the introduction of testimony or evidence supporting Respondent's right to collect under the Guaranty. Stefani does not assert he was not on notice of the default, just that it was not pled. Finally, Stefani's motion to alter or amend did not raise the issue of whether the Guaranty was properly pled. As we find the issue regarding the applicability of the Guaranty was tried by consent, we affirm the decision of the Master requiring payment of $30,000.00 by Stefani.

Stefani contends the Guaranty was merged out of existence and, therefore, Ronco and Miccichi could not collect damages. In the brief, Ellie and Stefani fail to cite any supporting authority for the position, and all arguments made are merely conclusory statements. South Carolina Appellate Court Rules specify what is required in the arguments section for an appellant's brief: "The brief shall be divided into as many parts as there are issues to be argued. At the head of each part, the particular issue to be addressed shall be set forth in distinctive type, followed by discussion and citations of authority." Rule 208(b)(1)(D), SCACR. Numerous cases have held that where an issue is not argued within the body of the brief but is only a short conclusory statement, it is abandoned on appeal. *Glasscock, Inc. v. United States Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct.App.2001); *R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 437, 540 S.E.2d 113, 120 (Ct.App.2000); *Welch v. Epstein*, 342 S.C. 279, 288 n. 1, 536 S.E.2d 408, 412 n. 1 (Ct.App.2000). We find Stefani and Ellie abandoned the issue on appeal.

## IV. Concealment and other Findings of Fact

Stefani maintains the Master made several errors in his findings of fact. He asserts these errors detail a bias on the part of the judge. Finally, he contends the Master erred in concluding Stefani concealed income from the gaming machines. We find no evidence of bias on the part of the Master and rule his finding of fact that Ellie concealed income was supported by ample evidence.

Stefani first asserts the trial court erred in finding: "The Lease had been amended, modified, and/or superceded by a number of later agreements, giving rise to a dispute as to what agreements were in effect in 1999." Stefani avers the Lease Option Agreement played no part in the parties' dispute, and the only controversy was regarding the video gaming revenues.

However, there is ample evidence in the record showing Miccichi, through his counsel, requested a statement from Stefani as to what agreements were in effect and whether the merger agreement applied to the lease. Stefani's counsel

refused to issue a response regarding what agreements were in effect, and instead answered: "Given the present conflict between the parties, my client will not set forth a blanket statement of its position regarding the merger clause. Instead, the applicability and affect [sic] of the clause will have to be determined on a case by case basis if, and when, a conflict arises between two competing agreements." While much of the dispute did involve the gaming revenues, there were further questions regarding what agreements were controlling. The finding of fact challenged by Stefani plays little to no part in the ultimate decision of the Master. Regardless, there is evidence in the record to support the finding of the Master.

Stefani next asseverates the Master erred in finding he "undertook a course of conduct to leverage and cause Miccichi to give him a share in the revenue." Again, the finding of fact is not highly relevant to the ultimate conclusion of the Master. However, we rule it was supported by evidence in the record. Testimony was presented that gaming machines were unplugged or had other problems prior to Stefani being given a share of the machines revenues. A provision in one of the agreements specifically required the machines to stay plugged in during operating hours. The above evidence supports the Master's finding of fact.

Next, Stefani contends the trial court erred in finding: "Having Ellie report its computation of money owed first served as a check and balance system to Miccichi's numbers.... Stefani stopped giving Kate his spread sheet [sic], and then stopped giving his numbers first, subtly inducing her to give her numbers from the period Z tapes first." Miccichi testified that Stefani gave him the revenue reports, and then they would be reconciled with Miccichi's reports. His daughter averred that Stefani would get her report first or would not give her a report at all during the reconciliation. Finally, the main conflict over the money reported compared to the money received originated when Miccichi discovered entries in Stefani's records for dates when Miccichi and his daughter were both out of town. We find there was evidence presented to support the conclusion of the Master.

 Finally, Stefani argues the Master erred in ruling he concealed money from Miccichi. However, there is evidence in the record to support the finding that money was concealed and Stefani had a duty to report the money to Miccichi.

Stefani improperly recorded money on several occasions, and because of the resets, Ellie had more money on hand than it was supposed to collect. The Master found Ellie had additional money and had a duty to disclose that to Miccichi.

 "The duty to disclose may be reduced to three distinct classes: (1) where it arises from a preexisting definite fiduciary relation between the parties; (2) where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied; (3) where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure without regard to any particular intention of the parties." *Regions Bank v. Schmauch*, 354 S.C. 648, 673–74, 582 S.E.2d 432, 445–46 (Ct.App.2003). "Parties in a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud." *Anthony v. Padmar, Inc.*, 320 S.C. 436, 449, 465 S.E.2d 745, 752 (Ct.App.1995). "Nondisclosure is fraudulent when there is a duty to speak." *Ardis v. Cox*, 314 S.C. 512, 517, 431 S.E.2d 267, 270 (Ct.App.1993). "Non-disclosure becomes fraudulent concealment only when it is the duty of the party having knowledge of the facts to make them known to the other party to the transaction." *Lawson v. Citizens S. Natl. Bank of S.C.*, 259 S.C. 477, 481–82, 193 S.E.2d 124, 126 (1972); *accord Manning v. Dial*, 271 S.C. 79, 83, 245 S.E.2d 120, 122 (1978); *Jacobson v. Yaschik*, 249 S.C. 577, 585, 155 S.E.2d 601, 605 (1967).

Under the July 1998 agreement, Ellie was responsible for collecting the money from the machines and the agreement stated: "If Ellie withholds any money taken from the machines it will be considered theft...." The concealment by

Ellie of the additional money in its possession amounted to a breach of contract and a fraudulent concealment.

The court's order states:

This court finds that while there is no direct evidence that Stefani unlawfully took the money out of the machines and caused the resets, there is substantial circumstantial evidence that proves Ellie, either through Stefani or one of its other agents, did so.

. . . .

The handling of another person's cash is intrinsically fiduciary. The operation of the contract necessarily relied in part upon Stefani's honesty. Silence in the face of these duties constituted concealment and fraudulent activity.

We find evidence in the record to support the ruling by the trial court that Ellie had additional money on hand. Stefani had a duty to report it or turn it over to Miccichi, failed to perform on that duty, and therefore, concealed money from Miccichi.

## V. Laches, Equitable Estoppel, and Waiver

Finally, Appellants maintain the trial court erred in not holding Respondents waived their right to complain about the additional revenues in Ellie's possession, or in the alternative, Respondents were barred from asserting the breaches by operation of the doctrine of laches or equitable estoppel. We disagree.

First, the issue may not be preserved for review on appeal. The Master did not specifically rule on any of the doctrines in his final order. The motion to alter or amend does not appear in the record, and the transcript of the hearing does not evidence the fact that these doctrines were specifically raised to the trial court. As such, they would not be preserved for review on appeal.

"It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review." *Staubes v. City of Folly Beach,* 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) (citing *Creech v. South Carolina Wildlife and Marine Res. Dep't,* 328 S.C. 24, 491 S.E.2d 571

(1997)). "Error preservation requirements are intended 'to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments.'" *Id.* (citing *I'on v. Town of Mt. Pleasant,* 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000)); 4 C.J.S. *Appeal and Error* § 213 (1993). "Without an initial ruling by the trial court, a reviewing court simply would not be able to evaluate whether the trial court committed error." *Id.* "It is well settled that ... an appellate court cannot address an issue unless it was raised to, *and ruled upon by,* the trial court." *Smith v. Phillips,* 318 S.C. 453, 455, 458 S.E.2d 427, 429 (1995) (emphasis added) (citing *Beaufort County v. Butler,* 316 S.C. 465, 451 S.E.2d 386 (1994)). *See Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review.").

■ On the merits, every indication was that Miccichi trusted Stefani and relied upon Ellie through Stefani to keep proper records. Stefani was under obligation to report deviations and not withhold excess money. Miccichi found out about the discrepancies in the record keeping as soon as disagreements between the parties began. He immediately took steps to examine the records, including requesting Stefani's records and attempting to take control of the collection process. Appellants give no indication that the additional money in Ellie's possession could have been discovered sooner. There is sufficient evidence to support the conclusion that Respondents did not waive their right to complain about the breaches, nor do the doctrines of equitable estoppel or laches prevent them from maintaining Appellants breached the contract.

## CONCLUSION

We find the Lease Option and the numerous subsequent agreements form one contract under which the parties were operating at the time their dispute arose in 1999. Appellants have breached various provisions of the contract, including the video gaming provisions relating to the collection and distribution of revenues. These breaches are sufficient justification for the termination of the lease. We conclude the personal

Guaranty signed by Stefani was still in existence and enforceable. The Master correctly found Stefani liable for up to $30,000.00 of damages. Respondents did not waive their right to argue the retention of the money by Appellants was a breach of the contract, and neither the doctrine of equitable estoppel nor laches apply to bar the termination of the lease. Based on our standard of review, we find there was evidence to support the findings of the Master. Accordingly, the decision of the Master is

**AFFIRMED.**

GOOLSBY and HOWARD, JJ., concur.