751 S.E.2d 664

ZAN, LLC, Appellant,

v.

RIPLEY COVE, LLC, W.H. Knight, Karl A. McMillan, individually and as the principal of Karl A. McMillan, Inc., St. Andrews Title & Abstract Agency, Inc., Chicago Title Ins. Co. and Charles A. Funk & Lillian M. Funk, Defendants,

Of whom Ripley Cove, LLC, W.H. Knight, Karl A. McMillan, individually and as the principal of Karl A. McMillan, Inc., and East Coast Trading Co., are the Respondents.

ZAN, LLC, Plaintiff,

v.

East Coast Trading Co., Defendant.

Appellate Case No. 2012–209606.

No. 5183.

Court of Appeals of South Carolina.

Heard Oct. 7, 2013.

Decided Nov. 27, 2013.

Andrew K. Epting, Jr., and Michelle Nicole Endemann, both of Andrew K. Epting, Jr., LLC, of Charleston, for Appellant.

Stanley E. Barnett, of Smith, Bundy, Bybee, & Barnett, PC, of Mt. Pleasant, for Respondents East Coast Trading Co. and Ripley Cove, LLC, and Kerry W. Koon, of Charleston, for Respondents Karl A. McMillan and Karl A. McMillan, Inc.

PER CURIAM.

ZAN, LLC (ZAN) filed these consolidated actions against Ripley Cove, LLC, W.H. Knight, Karl A. McMillan, individually and as the principal of Karl A. McMillan, Inc., W.M. Belote, East Coast Trading Company (East Coast), St. Andrews Title & Abstract Agency, Inc., Chicago Title Insurance Company, and Charles A. and Lillian M. Funk.[1] ZAN sought rescission of a contract and damages. After a bench trial, the trial judge refused to rescind the contract, but the judge awarded ZAN $10,000 in joint and several damages against Respondents. ZAN appealed. We reverse and remand.

---

1. Ripley Cove, LLC, W.H. Knight, Karl A. McMillan, Karl A. McMillan, Inc., W.M. Belote, and East Coast are Respondents. The Honorable R. Markley Dennis entered an Order of Default as to Karl A. McMillan. The Honorable Deadra Jefferson entered an Order of Default as to Karl A. McMillan, Inc. McMillan and McMillan, Inc., moved for relief from default. The Honorable J.C. Nicholson, Jr., denied the motion.

## I. BACKGROUND

Edgar Buck owns *Rookie IV*, a 61-foot boat, which has a 19.6-foot beam and requires a dock slip 20 feet in width. *Rookie IV* is valued at close to $6 million. Buck moored the boat at a slip in the busy waterway of Wappoo Cut in the Coastal Waterway, where it regularly sustained damage.

Buck's daughter, Susanne Cantey, owns ZAN, and Buck has authority to act on behalf of ZAN. Susanne wanted a waterfront lot to build a home, and Buck wanted a boat slip out of the waterway for *Rookie IV*. Buck's real estate agent, Lynn Carmody, escorted Buck and Susanne to Ripley Cove to view lots. They met with McMillan, who was the real estate broker acting as the selling agent for Ripley Cove.

Buck testified McMillan represented the largest boat slip, B1, went with the lot ZAN was considering purchasing. Buck maintained that when he and Susanne toured the home lot, McMillan pointed to a boat slip near a long, floating dock. McMillan did not show Buck a plat, but he allegedly emphasized that B1 was the longest slip and went with the lot ZAN was contemplating purchasing.

In February 2005, ZAN contracted with East Coast to purchase B1 for himself and Lot 3 in Ripley Cove for Susanne. The sales contract for the lot and slip, priced at $700,000, did not specify a particular boat slip, and ZAN did not receive a plat. Susanne signed the contract on behalf of ZAN, and W.H. Knight signed on behalf of Ripley Cove. The closing was scheduled for March 5, 2005.

Buck received a copy of the plat a day or two prior to the scheduled closing date. The plat indicated the slip designated by McMillan as B1 was actually two slips, B1 and B2. Buck refused to close and told McMillian he needed a 20-foot clearance and two pilings. McMillan indicated Ripley Cove would reduce the price by $20,000, increase clearance in B1 to twenty feet, and add the pilings. The pilings were to be built between March 5th and 6th. The closing was rescheduled for April 5, 2005.

Buck viewed the slip just prior to the next scheduled closing date, and the pilings had not been installed. He went to the closing and again refused to close. McMillan allegedly repre-

sented that Ripley Cove had approved the pilings, and he would certify the pilings would be put in place with a twenty foot clearance. Dan David, the closing attorney, left the conference room, called Ripley Cove's "owners," returned and confirmed, according to Buck, an agreement to the pilings and a 20 foot clearance. David issued a letter confirming the agreement and stating there was sufficient money in escrow to pay for the pilings. The letter stated: "two piling[s] will be replaced in line with the existing pilings of the adjoining boat slips . . . ." Based on the letter, Buck agreed to close. The Master Deed provided that the slip issued with each lot was to be determined upon contract.

Buck continuously called David regarding the installation of the pilings. In June 2006, Buck received a letter from Dock and Marine, Inc., indicating it been hired to install one piling. Buck contacted Dock and Marine and informed them the contract should have been for two pilings. When the pilings were still not built, Buck contacted the permitting authority to see if a permit had been applied for and was told, "No." In 2008, Buck learned he could not have a 20–foot clearance because B2 had been sold.

Buck testified he met with the purported owner of Ripley Cove, Doc Knight. Buck testified he told Knight the pilings had to be placed inside B2 so as to provide B1 with a 20–foot clearance. According to Buck, Knight asked him where he wanted the pilings and assured Buck it would be "done." Knight denied Buck requested part of B2 and testified he understood Buck merely wanted pilings placed so B1 would be marked.

Susanne testified the plat ZAN was given prior to signing the sales contract showed only the lot. She stated McMillan indicated B1 was the slip ZAN was purchasing, and she thought it was 35 feet wide. She did not learn it was actually two slips, B1 and B2, until just prior to the first scheduled closing. Susanne acknowledged the Master Deed, recorded in August 2004, indicated the two boat slips. Carmody likewise testified McMillan represented that the entire 35–foot slip was one slip that went with the lot.

David testified it was either Knight or Michael Belote, on behalf of East Coast, that approved the letter he wrote at

closing. According to David, Knight had power of attorney to act on Belote's behalf. David testified Ripley Cove was owned by East Coast and Pavilion. After the contract was signed, but before the parties closed and the deed was executed, B1 was transferred from Ripley Cove to East Coast, and B2 was transferred to Pavilion. Thus, David admitted that at the time the closing actually occurred, Ripley Cove no longer owned B1 or B2.

David also explained that all of the pilings were common elements owned by the Ripley Cove Homeowners' Association (HOA). David testified numerous projects on the dock were delayed until Ripley Cove had a permit to dredge and had completed dredging the marina, which did not occur until 2008. David testified he did not realize Buck wanted footage from B2; David thought Buck merely wanted pilings to be built. David admitted the actual clearance in B1 was only about 18 feet.

Respondents called numerous fact witnesses to testify that the marina and pilings at Ripley Cove required permits by the State of South Carolina; the dredging of the canal required federal permitting; and the typical time to receive state and federal permits was between twelve and eighteen months, and the two-and-a-half years it took Ripley Cove to receive the permit to add pilings to B1 was longer than ordinary.[2]

McMillan testified it was the responsibility of Ripley Cove to install the pilings because at the time the sales contract was signed, it still controlled the HOA. McMillan denied he knew B2 had been sold at the time of the closing; however, he acknowledged he was aware the deal was contingent on *Rookie IV* fitting into the slip. McMillan claimed the agreement for pilings was to define the B1 boundaries, and he denied representing B1 would be widened. He admitted it would have been possible to reduce the width of B2 to add to the width of B1 if the parties had agreed upon it.

McMillan also testified *Rookie IV* was 17 feet 8 inches wide, and he believed it would fit into B1, which he claimed was 20 feet wide. He admitted that although the slip measured 20 feet in width, he did not know the clearance. McMillan

2. The public notice of application for the permit was dated June 13, 2008. Ripley Cove received the permit on January 12, 2011.

acknowledged the pilings would take about eight to twelve inches each, and *Rookie IV* could not fit into the back of the slip because of power boxes in the slip. As a reply witness, Buck testified he measured the floating dock that jutted into B1. According to his measurements, the actual clearance of that part of B1 was "something short of 15 feet."

Mike Belote testified he owned East Coast, which was a part-owner of Ripley Cove. Belote confirmed he was aware of Buck's demands on the date of closing, and he approved the pilings. However, he did not realize Buck wanted part of B2.

Knight was the broker for the project. He confirmed stating at the closing that he would do what he could to install the pilings. He also testified he met Buck at the property after the closing to confirm where Buck wanted the pilings to be placed. Knight denied understanding that Buck wanted them placed inside B2. Knight testified the cost of installing the pilings would be approximately $2,500.

Thomas Hartnett, a real estate appraiser, valued the slip alone at $40,000 and estimated the combined value of the lot and slip at $530,000. Buck placed the lot and slip on the market for $800,000, but testified he "would be surprised if it would bring $400,000."

ZAN filed an action against the defendants on July 25, 2008, and a second action on June 2, 2009, seeking rescission of the contract and damages from East Coast and Ripley Cove. Buck alleged damages of more than $1.4 million, including the purchase price, taxes, architecture services, regime fees, interest, and insurance.

After the bench trial, the trial judge made numerous factual findings that were not appealed such as: (1) a condition of the contract was that *Rookie IV* must fit into the slip; (2) *Rookie IV* did not fit into the slip; (3) McMillan informed Buck that the Sellers owned B2 and that "it would be no problem to give Mr. Buck the 20–foot clearance he needed and [to] place the pilings in ... B2 (the adjoining slip)"; and (4) ZAN reasonably relied upon David's letter. Thus, the judge found ZAN proved its claims.[3] However, as to ZAN's entitlement to the remedy of rescission, the trial judge found the following:

---

3. Respondents have not appealed the factual findings or conclusions of law; accordingly, they are the law of the case. *See Carolina Chloride,*

This case presents a unique situation as there is no issue with the upland parcel the Bucks purchased with the slip. Ordinarily, if part of a contract can be performed, the damages can be fashioned so as to reflect the breach. However, in this case the Master Deed specifically forbids the separation of the upland parcel from [the] boat slip, complicating this Court's task. The Court cannot order the return of the slip with Z[AN] keeping the upland parcel about which there is no quarrel. Rescission is an equitable remedy which I choose not to grant. Rather, I award damages in the sum of $10,000.00 for the breach of the contract and negligent misrepresentation.

This appeal followed.

## II. STANDARD OF REVIEW

In an action alleging entitlement to both money damages and equitable relief, the characterization of the action as legal or equitable depends on the plaintiff's "main purpose" in bringing the action. *Doe v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 347 S.C. 642, 645–46, 557 S.E.2d 670, 672 (2001). ZAN's "main purpose" in instituting this action was to rescind the contract; thus, the main purpose of the action was equitable in nature. *See Dixon v. Dixon*, 362 S.C. 388, 395, 608 S.E.2d 849, 852 (2005) (stating an action for rescission of a contract is an equitable action).

The appellate court reviews factual findings and legal conclusions in an equitable action de novo. *Lewis v. Lewis*, 392 S.C. 381, 387–88, 709 S.E.2d 650, 653 (2011). "De novo review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the trial court's findings." *Id.* at 390, 709 S.E.2d at 654–55. "However, this broad standard of review does not require the appellate court to disregard the factual findings of the trial court or ignore the fact that the trial court is in the better position to assess the credibility of the witnesses." *Nutt Corp. v. Howell Rd., LLC*, 396 S.C. 323, 327, 721 S.E.2d 447, 449 (Ct.App.2011).

---

*Inc. v. Richland Cnty.*, 394 S.C. 154, 172, 714 S.E.2d 869, 878 (2011) (noting "an unchallenged ruling, right or wrong, becomes the law of the case").

## II. LAW/ANALYSIS

ZAN argues the trial judge erred in refusing to rescind the contract after concluding Respondents were liable in contract and tort. We agree.

Under our own view of the preponderance of the evidence, we agree with the trial judge's findings of fact. It was clear to all parties that the main purpose of the contract was to provide Buck with a slip to accommodate *Rookie IV.* ZAN refused to close at the first scheduled closing when it appeared B1 was not sufficiently wide to berth *Rookie IV.* ZAN again refused to close at the second scheduled closing until promised accommodation for *Rookie IV.* Furthermore, the testimony indicates the existing clearance in B1 could not accommodate *Rookie IV.* Next, Respondents led Buck to believe they owned B2 and would utilize B2 to enlarge B1. Finally, we agree with the trial judge that ZAN's reliance on David's letter at the closing was reasonable. We likewise agree with the trial judge's conclusion that ZAN proved its claims for breach of contract and negligent misrepresentation.

■ However, we respectfully disagree with the learned trial judge's conclusion that ZAN was not entitled to the remedy of rescission. The trial judge denied rescission because there was no dispute regarding the upland parcel. Because we find the slip was a fundamental and substantial purpose of the contract, we conclude ZAN was entitled to rescission despite the parties' lack of dispute regarding the upland parcel. Furthermore, rescission is not unavailable due to the restriction in the Master Deed prohibiting the separation of the lot and slip. Rather, rescission would undo the contract *in toto,* rescinding the sale of both the lot and the slip.

■ "Rescission is an equitable remedy that attempts to undo a contract from the beginning as if the contract had never existed." *Mortgage Elec. Sys., Inc. v. White,* 384 S.C. 606, 615, 682 S.E.2d 498, 502 (Ct.App.2009). Generally, equitable relief is available only where there is no adequate remedy at law. *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n,* 298 S.C. 179, 185, 379 S.E.2d 119, 123 (1989). "An 'adequate' remedy at law is one which is as certain, practical,

complete and efficient to attain the ends of justice and its administration as the remedy in equity." *Id.*

■■■ "A breach of contract claim warranting rescission of the contract must be so substantial and fundamental as to defeat the purpose of the contract." *Brazell v. Windsor,* 384 S.C. 512, 516–17, 682 S.E.2d 824, 826 (2009) (citing *Rogers v. Salisbury Brick Corp.,* 299 S.C. 141, 143, 382 S.E.2d 915, 917 (1989)). "[R]escission will not be granted for a minor or casual breach of a contract, but only for those breaches which defeat the object of the contracting parties." *Id.* at 517, 682 S.E.2d at 826.

We find the breach of contract in this case was substantial, fundamental, and defeated the purpose of the contract. *See Brazell,* 384 S.C. at 518, 682 S.E.2d at 827 (finding rescission may be appropriate despite the seemingly *de minimis* breach of $2,000 on a real estate contract of $550,000 and stating "real estate contracts are unique and courts should evaluate the purpose of the real estate contract and the materiality of a breach in light of these differences" in determining whether rescission is appropriate). Thus, we reverse the trial judge's refusal to rescind the contract based on the parties' lack of dispute as to the upland parcel.

■■■ We likewise reject Respondents' argument that ZAN is not entitled to rescission because it did not timely demand rescission. A party seeking rescission must "promptly and unequivocally" provide notice of the intention to demand rescission. *Davis v. Cordell,* 237 S.C. 88, 100, 115 S.E.2d 649, 655 (1960). In this case, the trial judge found Knight continued to represent to Buck "[u]p to and after the summer of 2006" that pilings would be put in place. Buck received a letter in June 2006 from a contractor who had been hired to install a piling. Respondents' own witnesses testified extensively regarding the inability to alter the marina until after permitting and dredging were completed, and the public notice required to seek the permit was dated June 13, 2008. Buck testified he did not learn B2 had been sold until 2008. ZAN filed its first action in July 2008, and a second action on June 2, 2009. We find no unreasonable delay precluding ZAN from seeking rescission.

 Our analysis next focuses on whether the parties can be returned to the status quo prior to the contract. "When a party elects and is granted rescission as a remedy, he is entitled to be returned to status quo ante." *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 95, 594 S.E.2d 485, 494 (Ct.App.2004). Thus, the party is entitled to a return of the consideration paid in addition to any amount necessary to restore him to the position he occupied prior to the making of the contract. *Id.* ("A return to the status quo ante necessarily requires any party damaged to be compensated.").

 However, "[i]n the absence of fraud, rescission is appropriate only if both parties can be returned to the status quo prior to the contract." *Brazell*, 384 S.C. at 517, 682 S.E.2d at 826–27 (citation omitted). "[W]hether it would be fair and equitable to rescind [a] contract is a different issue from whether Petitioners have sufficiently alleged a material breach of contract and sufficiently alleged that rescission would allow them to be restored to the status quo." *Id.* at 519, 682 S.E.2d at 828. Because the trial judge made no findings regarding the feasibility of returning these parties to the status quo, we remand.[4]

## IV. CONCLUSION

Based on the foregoing analysis, the trial judge's order is **REVERSED AND REMANDED.**

SHORT, WILLIAMS, and THOMAS, JJ., concur.

---

4. Because we reverse and remand on the issue of rescission, we decline to address ZAN's argument regarding the trial judge's error in awarding only $10,000 in damages. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling that an appellate court need not review remaining issues when disposition of prior issues is dispositive).