688 S.E.2d 150

**BLACKBAUD, INC., Respondent,**

v.

**SOUTH CAROLINA DEPARTMENT OF REVENUE, Appellant.**

**No. 4645.**

Court of Appeals of South Carolina.

Heard Oct. 6, 2009.
Decided Jan. 11, 2010.

Carol I. McMahan, Ray N. Stevens, Harry T. Cooper, and Nicholas P. Sipe, all of Columbia, for appellant.

Burnet R. Maybank, III and Joan W. Hartley, both of Columbia, for respondent.

HEARN, C.J.

In this appeal, the South Carolina Department of Revenue (Department) contends the administrative law court (ALC) erred in finding Blackbaud was entitled to claim job development tax credits for jobs created after the cut-off date. We affirm as modified.

## FACTS

In 1995, the General Assembly enacted the Enterprise Zone Act (Act) to provide tax incentives for businesses to locate or expand in rural counties in South Carolina. The Act created the Advisory Coordinating Council for Economic Development (Council) and allowed qualifying businesses to submit an application to the Council for approval.[1] S.C.Code Ann. §§ 12–10–20(3) to –100(A) (2000 & Supp.2008). In order to qualify for tax incentives under the Act, businesses were required to meet the eligibility requirements established by section 12–10–50(A)(1)–(4) of the South Carolina Code (Supp.2008). Of particular importance for purposes of this appeal, section 12–10–50(A)(3) required businesses to enter into a revitalization agreement (RVA) with the Council. The Act gave the Council absolute discretion in deciding whether to enter into an RVA with an otherwise qualifying business. S.C.Code Ann. § 12–10–60(A) (Supp.2008). Furthermore, the Act allowed the Council and the qualifying business to negotiate the terms of the RVA. *Id.* Although the terms of each individual RVA varied, every RVA uniformly required each business to create a minimum number of jobs and make a minimum capital

---

1. The Council consists of the heads or board chairs of ten state agencies concerned with economic development.

investment by a certain date (cut-off date) in order to claim job development credits. *Id.;* S.C.Code Ann. § 12–10–80(A) (Supp.2008). Under the Act, as soon as a business met the minimum job requirement and minimum capital investment set forth in the RVA, the business was eligible to claim job development credits. § 12–10–80.

Blackbaud, the largest software developer in the world for non-profit organizations, moved its headquarters from New York to Berkeley County in order to take advantage of the tax incentives provided by the Act. On October 22, 1997, Blackbaud entered into an RVA with the Council. In the RVA, Blackbaud agreed to create three hundred new jobs at its new facility on Daniel Island and invest a minimum of $29.6 million in the project before the cut-off date on October 22, 2002. In addition, the RVA contained an important provision commonly referred to as the 85/150 rule. At the time Blackbaud entered into the RVA with the Council, the Council had adopted Guidelines to assist it in determining whether a business was eligible to receive job development credits. The 85/150 rule was one of many guidelines adopted by the Council. The 85/150 rule in the RVA provided, "[o]nce it meets the Minimum Job Requirement, the Company may fall below the Minimum Job Requirement by 15 percent or exceed the Minimum Job Requirement by 50 percent and remain eligible to claim Job Development Credits."

Blackbaud met the job and capital investment requirements on September 30, 2001—more than a year before the cut-off date—and began claiming job development credits in October 2001. While Blackbaud only agreed in the RVA to create three hundred new jobs, it took advantage of the 85/150 rule and created more than three hundred jobs, while also claiming job development credits for them, during every quarter leading up to the cutoff date. In the last quarter before the cut-off date, Blackbaud claimed job development credits for 398 new jobs—its highest total to date. After the cut-off date, Blackbaud claimed job development credits in excess of 398 for every quarter from January 1, 2003, through December 31, 2005.[2] Blackbaud reported the number of job development

---

**2.** Blackbaud never violated the 85/150 rule by claiming job development credits in excess of 450 jobs.

credits it claimed each quarter on reports submitted to the Council. In addition, Blackbaud submitted annual reports to the Council, certifying it had not violated the 85/150 rule. The Council reviewed Blackbaud's quarterly and annual reports and never communicated to Blackbaud that these reports were inaccurate or improperly completed.

In 2004, the Council adopted new Guidelines amending the 85/150 rule. Although the new rule did not apply to Blackbaud,[3] the amended version of the 85/150 rule provided:[4]

[T]he Council will allow a company, once it meets the minimum job requirement to fall below the minimum job requirement by 15% and remain eligible to claim [Job Development Credits]. If a company exceeds the minimum job requirement, that company may claim [Job Development Credits] on the excess jobs up to 50% of the minimum job requirement. Jobs created in excess of the "Minimum Job Requirement" shall be deemed to include only such "New Jobs" as are created at the "Project" prior to the "Cut-off Date" as those terms are defined in the final RVA.

The Department audited Blackbaud's tax returns in July 2006. Although this was the second time the Department audited Blackbaud's tax returns, this audit was the first since the cut-off date and the promulgation of the new Guidelines. Unlike the first audit, the Department concluded Blackbaud had calculated job development credits incorrectly. Specifically, the Department determined the text of the initial 85/150 rule prevented Blackbaud from claiming job development credits in excess of those claimed at the time of the cut-off date. Thus, the Department refused to allow Blackbaud to claim job development credits in excess of 398 jobs.

On August 9, 2006, the Department issued a proposed assessment to Blackbaud, seeking to recoup $281,264 in job development credits. Blackbaud filed a timely protest to the proposed assessment. On June 15, 2007, the Department issued its final agency determination, reasserting its claim to the money. Thereafter, Blackbaud requested a hearing be-

---

3. The new rule only applies to "applications or RVAs pending as of February 1, 2004."

4. Underlined portions of the rule indicate changes in the Guidelines.

fore the ALC to review the Department's final determination. The ALC ruled in favor of Blackbaud, finding Blackbaud was eligible to claim job development credits on "newly created jobs in an amount not to exceed 150% of the Minimum Job Requirement (450 in this case), for a five-year-period commencing on the date the RVA received final approval by the Department of Commerce." This appeal followed.

## STANDARD OF REVIEW

This court's scope of review is set forth in section 1–23–610(B) of the South Carolina Code (Supp.2008). That section provides:

> The review of the administrative law judge's order must be confined to the record. The court may not substitute its judgment for the judgment of the administrative law judge as to the weight of the evidence on questions of fact. The court of appeals may affirm the decision or remand the case for further proceedings; or it may reverse or modify the decision if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is:
>
> (a) in violation of constitutional or statutory provisions;
>
> (b) in excess of the statutory authority of the agency;
>
> (c) made upon unlawful procedure;
>
> (d) affected by other error of law;
>
> (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

## LAW/ANALYSIS

In this case, Blackbaud claimed a high of 398 job development credits before the cut-off date. After the cut-off date, Blackbaud claimed job development credits in excess of 398 for every quarter from January 1, 2003, through December 31, 2005. The ALC found the 85/150 rule allowed Blackbaud to claim job development credits on newly created jobs "in an amount not to exceed 150% of the minimum job requirement, *for a five-year period commencing on the date the RVA*

*received final approval* by the Department of Commerce."
(emphasis added). On appeal, the Department argues the
plain language of the 85/150 rule prevented Blackbaud from
claiming job development credits in excess of 398 jobs after
the cut-off date. We disagree.

■ When a contract or agreement is clear and capable of
legal construction, the court's only function is to interpret its
lawful meaning and the intent of the parties as found within
the agreement. *Smith–Cooper v. Cooper,* 344 S.C. 289, 295,
543 S.E.2d 271, 274 (Ct.App.2001). However, when an agree-
ment is ambiguous, the court should determine the parties'
intent. *Ellie, Inc. v. Miccichi,* 358 S.C. 78, 94, 594 S.E.2d 485,
493 (Ct.App.2004). A contract is ambiguous when it is capable
of more than one meaning or when its meaning is unclear.
*Jordan v. Sec. Group, Inc.,* 311 S.C. 227, 230, 428 S.E.2d 705,
707 (1993).

■ The RVA defines the minimum job requirement and
sets forth the 85/150 rule. It provides:

> Minimum Job Requirement means the minimum number of
> New Jobs the Company has agreed to create, prior to the
> Cut–Off Date, and maintain before claiming any Job De-
> velopment Credits. Once it meets the Minimum Job Re-
> quirement, the Company may fall below the Minimum Job
> Requirement by 15 percent or exceed the Minimum Job
> Requirement by 50 percent and remain eligible to claim
> Job Development Credits.

We find this language to be clear and unambiguous. Initially,
the first sentence defines the minimum number of new jobs
Blackbaud must create in order to claim job development
credits. This language unequivocally requires Blackbaud to
meet the minimum job requirement by the cut-off date. Thus,
according to the terms of the RVA, Blackbaud had to create
three hundred new jobs before October 22, 2002, in order to
claim job development credits. Both parties agree Blackbaud
met this requirement. The next sentence sets forth the 85/150
rule. The 85/150 rule allowed Blackbaud, after meeting the
minimum job requirement, to continue claiming job develop-
ment credits if it maintained eighty-five percent of the mini-
mum job requirement. Moreover, this sentence allowed
Blackbaud to exceed the minimum job requirement by fifty

percent and "remain eligible" to claim job development credits. However, the 85/150 rule contains no timing limitation. Unlike the minimum job requirement that required Blackbaud to create three hundred jobs by the cut-off date in order to claim job development credits, the 85/150 rule does not reference the cut-off date at all. Consequently, the 85/150 rule does not prohibit Blackbaud from claiming job development credits in excess of those created at the cut-off date. As a result, we find Blackbaud is entitled to claim the job development credits in question.

Additionally, the Department contends the plain language of the RVA does not support the ALC's finding that Blackbaud could take advantage of the 85/150 rule "for a five-year period commencing on the date the RVA received final approval by the Department of Commerce." We agree.

As we stated above, the 85/150 rule contains no timing limitation. Thus, pursuant to the terms of the parties' agreement, Blackbaud is eligible to take advantage of the 85/150 rule, not for a five-year period, but for as long as the RVA remains in effect. Nowhere in the RVA does it state that Blackbaud can only claim the benefit of the 85/150 rule for a five-year period. Because the plain language of the RVA does not support this portion of the ALC's ruling, the decision is modified to remove the five-year limitation.

Accordingly, the decision of the ALC is

**AFFIRMED AS MODIFIED.**

KONDUROS and LOCKEMY, JJ., concur.